Chester J. RYBICKI, et al., Plaintiffs,

v.

The STATE BOARD OF ELECTIONS OF the STATE OF ILLINOIS, et al., Defendants.

Miguel DelVALLE, et al., Plaintiffs,

v.

The STATE BOARD OF ELECTIONS OF the STATE OF ILLINOIS, et al., Defendants.

Bruce CROSBY, et al., Plaintiffs,

v.

The STATE BOARD OF ELECTIONS OF the STATE OF ILLINOIS, et al., Defendants.

Nos. 81 C 6030, 81 C 6052 and 81 C 6093.

United States District Court, N.D. Illinois, E.D.

Sept. 27, 1983.

---

Before CUDAHY, Circuit Judge, GRA-DY, District Judge and BUA, District Judge.

## RYBICKI III

CUDAHY, Circuit Judge.

This is the third and we think final chapter of this court's review of Illinois' 1981 state legislative redistricting. In our Opinion of January 20, 1983, as amended, we reevaluated the Crosby plaintiffs' complaints about the South Side district lines particularly in light of the 1982 amendments to the Voting Rights Act. *Rybicki v. State Board of Elections*, 574 F.Supp. 1147, No. 81 C 6030 (N.D.Ill. Jan. 20, 1983) (*"Rybicki II"*). Based on our reading of the amended Act, we asked the Commis-

sion to submit new district lines in several areas.

Since January, the Commission and the Crosby plaintiffs have worked together to reach an agreement on the new lines.[1] We have before us now a Settlement Agreement.[2]

After reviewing the Settlement Map (which is attached to this Opinion), we find that there has been a significant moving away from coincidence of black-white "boundaries" and the district lines of districts with a very high percentage of blacks. For example, the lines of house district 23 have changed substantially and the percentages of blacks in the district has been reduced from 94% to 84%. Similarly, in house district 24 the percentage of blacks has been reduced from 96% to 89% with some moderate changes in the district lines. The western boundary of house district 36 was left unchanged, as we expected it might be, in order to maintain the black population majority in senate district 18. *See Rybicki II* at 1157–1158. Finally, the boundaries of house district 31 were changed although the population percentages remained the same. All told a large number of census tracts were affected and we think a substantial step has been taken.

Therefore, since the Crosby and DelValle plaintiffs and the defendants have settled their differences, we hereby incorporate the Settlement Agreement into the redistricting plan ordered by this court on January 12, 1982.[3]

DATED: August 18, 1983

---

1. During this period, on April 12, 1983, Harold Washington was elected Mayor of Chicago, the first black to hold the office.

2. We emphatically do not agree with Judge Grady's evaluation of a settlement reached only after the vigorous and persistent efforts of counsel in trying and arguing this complex case and in pursuing settlement in the face of serious obstacles.

3. Judge Grady, in response to a motion of the Crosby plaintiffs protesting his criticisms, has revised his dissent of August 18, 1983, and substituted a somewhat expanded dissent, dated September 27, 1983. It appears that Judge Grady would still be dissatisfied with anything less than an attempted "color-blind" drawing of dis-

trict lines. *See* Dissenting opinion of Grady, J., N.D.Ill. Jan. 12, 1982, 574 F.Supp. 1082 at 1140–1142. We continue to believe this approach is misguided and, as they point out in their motion, would be of no help to Crosby plaintiffs in their quest for fair legislative representation. We also think that Judge Grady's comments on attorneys' fees are premature and irrelevant to the merits of the settlement agreement and that counsel on both sides have generally been diligent and effective in presenting and settling the issues in this complex case.

On October 7, 1983, the attorneys for the Crosby plaintiffs and for the defendant filed a further motion, denominated a "Joint Post-Trial Motion," in response to Judge Grady's revised dissent, filed September 27, 1983. The verified

## AMENDED DISSENT TO CONSENT DECREE DATED AUGUST 18, 1983

GRADY, District Judge.

I dissent and decline to sign the consent decree. Despite some minor changes, the racial wall remains substantially intact, and it is still motivated by the same impermissible considerations which prompted my dissent from the decision of January 12, 1982. By virtue of this consent decree, it is now the law of this Circuit that voting district lines may be drawn—indeed, should be drawn—to suit the preferences of whites who do not wish to associate with blacks and to accommodate black politicians who desire to run in predominantly black districts.[1] These were the primary justifications of the racial wall advanced at the trial and approved by the majority in the decision of January 12, 1982.[2] Today's majority opinion states that in the recent revisions of the court plan which are incorporated in the consent decree, there is a "significant moving away of the coincidence of black-white 'boundaries' and the district lines of districts with a very high percentage of blacks." Assuming that to be true for purposes of discussion, there is still a substantial incidence of "black-white boundaries" (i.e., the racial wall) to be found in the revised map.

The Crosby plaintiffs and their attorneys have, in my view, settled a case they had a substantial chance of winning in the Supreme Court, with only slight risk of losing what they gained in this court.[3] It is clear to me that plaintiffs' attorneys do not have an independent understanding of the effects of the new boundary lines and that they continue to rely, as they have throughout this litigation, upon the attorney for the Commission to advise them concerning the demographics of the case. At the hearing on the proposed consent decree which was held on May 27, 1983, the attorneys for the Crosby plaintiffs were unable to explain the maps showing the latest changes and had to rely upon the attorney for the Commission to interpret them.

My dissatisfaction with the settlement is heightened by the fact that it includes not just the merits of the case but the important question of plaintiffs' attorneys fees as well. The appearance of a possible trade-off is hard to avoid in those circumstances, and, for that reason the courts have repeatedly admonished that any effort to negotiate fees should be postponed until after judicial resolution of the merits. *See White v. New Hampshire Department of Employment Security,* 455 U.S. 445, 453–54, n. 15, 102 S.Ct. 1162, 1167–68, n. 15, 71 L.Ed.2d 325 (1982) (simultaneous negotiation over fees and liability "may raise difficult ethical issues for a plaintiff's attorney ..."); *Parker v. Anderson,* 667 F.2d 1204, 1214 (5th Cir. Unit A), *cert. denied,* —— U.S. ——, 103 S.Ct. 63, 74

Joint Post-Trial Motion, filed by these attorneys, details their account of the events involved in reaching the Settlement Agreement. In an effort to be fair to the various attorneys participating in the lawsuit and the settlement and, in particular, to the attorneys for the Crosby plaintiffs, we have attached this Joint Post-Trial Motion, containing their version of events, as an Appendix to this opinion.

We of the majority do not believe that Judge Grady's revised dissent raises any issues of fact which require us to hold hearings to determine for ourselves the circumstances surrounding the Settlement Agreement. We are satisfied with the recitations of the Joint Post-Trial Motion, attached as an Appendix to this opinion. We, of course, have approved the Settlement Agreement and have indicated our complete satisfaction with it. We reiterate, with emphasis, our approval and satisfaction.

1. As the majority opinion points out (p. 1127, n. 1), Harold Washington, a black, was elected mayor of Chicago in April 1983. Mayor Washington's election seems not inconsistent with the view I expressed in my January 12, 1982, dissent (pp. 1138–1140) to the effect that quota-based districts are not only unconstitutional, they are unnecessary.

2. Majority opinion of January 12, 1982, pp. 1114–1115. *See also* dissenting opinion, p. 1127, n. 2.

3. It is important to note that this is not one of those near-hopeless situations where a litigant must persuade that overburdened court to take the appeal by way of *certiorari;* it is instead one of those rare cases where an appeal would be as of right. Therefore, there is little doubt the Supreme Court would address the question of the racial wall.

L.Ed.2d 65 (1982); *Obin v. Dist. No. 9, International Assoc. of Machinists*, 651 F.2d 574, 582–83 and 582, n. 10 (8th Cir. 1981) ("This situation may raise a serious ethical concern ... because counsel would be placed in the position of negotiating a fee ultimately destined for his pocket at the same time that all thoughts ought to be singlemindedly focused on the client's interest," 651 F.2d at 582 (footnote omitted); *Mendoza v. U.S.*, 623 F.2d 1338, 1352–53 (9th Cir.1980), *cert. denied sub nom., Sanchez v. Tucson Unified School District No. 1*, 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981) ("We cannot indiscriminately assume, without more, that the amount of fees have [sic] no influence on the ultimate settlement ... when, along with the substantive remedy issue, it is an active element of negotiation. [citation omitted] Nor do we believe that this potential conflict disappears simply because there is no fund or money damages being negotiated"); *Prandini v. National Tea Company*, 557 F.2d 1015, 1021 (3d Cir. 1977); *Jones v. Orange Housing Authority*, 559 F.Supp. 1379, 1384 (D.N.J.1983) ("[H]ad plaintiff's attorney initiated any such discussion [of attorney's fees prior to settlement of the merits], she would have been acting improperly"); *Munoz v. Arizona State University*, 80 F.R.D. 670, 671–72 (D.Ariz.1978) ("Attorneys fees are subsidiary to the issue of settlement and should be considered subsequent to reaching a tentative settlement by the parties. [citation omitted] The practice of plaintiffs' counsel here appears to have created a clear conflict of interest"); *Lyon v. Arizona*, 80 F.R.D. 665, 669 (D.Ariz.1978) (plaintiff's counsel's negotiation for his fees at the same time he was negotiating for settlement of the claims "constitutes a direct conflict of interest and is impermissible"); *Regalado v. Johnson*, 79 F.R.D. 447, 451 (E.D.Ill.1978) ("This interest in the fee makes it improper for the lawyer in a civil rights suit to inject the question of attorney's fees into the balance of settlement negotiations"); *City of Philadelphia v. Chas. Pfizer & Co.*, 345 F.Supp. 454, 471 (S.D.N.Y.1972) ("A plaintiff's lawyer who has an agreement that defendants will pay his fees has a strong motive so to conduct himself that defendants will not question or oppose the amount for which he ultimately applies as a fee"); *Norman v. McKee*, 290 F.Supp. 29, 36 (N.D.Cal.1968), *aff'd*, 431 F.2d 769 (9th Cir.1979). *See also Manual for Complex Litigation* § 1.46 (1981) (1 Pt. 2 Moore's Federal Practice, Pt. 1, § 1.46 (1981) at 75) ("When counsel for the class negotiates simultaneously for the settlement fund and for individual counsel fees, there is an inherent conflict of interest").

In this case, the sequence of events seems to me particularly unfortunate. In February 1982, the attorneys for the Crosby plaintiffs filed interim fee petitions covering their work up to the time of the original decision in the case. The amount claimed by Jenner & Block was $122,419.00, and, in addition, to the complete surprise of the court, two of the named plaintiffs who testified as witnesses in the case, State Representative Carol Moseley Braun and State Senator Richard Newhouse, claimed attorneys fees of $44,460.00 and $33,420.00 respectively. When these original fee petitions were filed in February 1982, a month following our original decision, the Commission filed lengthy and detailed objections in which it argued that plaintiffs were not entitled to recover any fees whatsoever. The Commission contended that the Crosby plaintiffs were not prevailing parties within the meaning of the Civil Rights Attorney's Fees Act, 42 U.S.C. § 1988, inasmuch as the plan proposed by Crosby plaintiffs had been rejected by the court. As an alternative position, the Commission argued that if plaintiffs were entitled to fees, it would be only on those aspects of the case where they prevailed. And in no event, urged the Commission, should the plaintiffs Braun and Newhouse be allowed any attorneys fees, because, *inter alia, pro se* plaintiffs have consistently been denied fees under Section 1988. The Commission went on to argue that in the Jenner & Block claim there was considerable duplication of time and that a

percentage of the amount claimed should be deducted on this account. The Commission further contended that the use of a multiplier was inappropriate because the case was not particularly complex. Finally, the Commission objected to most of the expenses for which reimbursement was sought, including the $50,000.00 requested for United Technologies Unlimited.

This was the position of the Commission in April 1982, when the parties were still at odds on the merits of the case.[4] The Commission has now done a complete about-face. The attorney for the Commission has advised the court that the Commission has no objection to the fees being claimed by Jenner & Block, counsel for the Crosby plaintiffs, nor by Braun and Newhouse. It is apparent that the Commission desires to bring about payment of the full amount claimed, but it needs a court order to do so. The attorney for the Commission has written the court a letter praising the Crosby attorneys, as well as Braun and Newhouse, and stating that the Commission agrees that the time claimed to have been spent "was certainly reasonable and although several lawyers represented the same class of plaintiffs, appropriate efforts were made to avoid duplication of work." The letter is not simply a consent that the fee petitions be granted in full, it is virtually a *request* that they be granted in full. The interim amount requested by Jenner and Block has

now been increased to a final figure of $279,808.80. The claims of Braun and Newhouse remain at $44,460.00 and $33,420.00, so that the total attorneys fees the Commission is willing to have paid from public funds for the Crosby plaintiffs is $357,688.90. The Commission has abandoned its argument that fees should be allowed only for the work which related to the issues on which plaintiffs prevailed, despite the fact that large amounts of time were spent in connection with matters on which the plaintiffs clearly did not prevail.[5] Apparently there is no objection either to the costs being claimed by plaintiffs' attorneys, including the $50,000.00 to United Technologies Unlimited for preparation of a map that was rejected by the court. And, in what is a first in my experience, the Commission no longer makes any objection to the 20 per cent multiplier requested by Jenner & Block, by Braun and by Newhouse. I have never heard of another case in which one side has conceded, much less practically urged, that the other side is entitled to a multiplier.

This case has accomplished some good, but I believe we have stopped woefully short of what the Constitution requires. It is the policy of the law to favor settlements, but I am greatly troubled about this one, both on the merits and because of the attendant circumstances.

4. *I express no view at this time concerning the validity of the Commission's arguments except to state that they were clearly not frivolous. The significant thing for present purposes is that the arguments were made.*

5. *An example is the work done on the map which was tendered as part of plaintiffs' offer of proof made after the trial was concluded. The offer was refused by the court as coming too late and the map was not even considered. The point here is not so much that the plaintiffs are clearly not entitled to fees for work which did* not contribute to the final result. Arguments could be made either way as to whether particular work did or did not contribute. The point, rather, is that in this case we are witnessing a rare if not unique exhibition of generosity by a party litigant: an agreement that the opponent be compensated for every minute of the more than 2,000 hours claimed to have been spent on the case. This is particularly questionable since we are dealing here not with private parties making business judgments but with a governmental body spending taxpayer funds.

PRE-SETTLEMENT MAP

(shaded area represents +85% black population)

SETTLEMENT MAP

(shaded area represents +85% black population)

APPENDIX

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BRUCE CROSBY, et al., | ) | No. 81 C 6093 |
| | ) | |
| Plaintiffs, | ) | (Consolidated with |
| | ) | Case Nos. 81 C 6052 and |
| v. | ) | 81 C 6030) |
| | ) | |
| THE STATE BOARD OF ELECTIONS | ) | Hon. Richard D. Cudahy |
| OF THE STATE OF ILLINOIS, | ) | Hon. John F. Grady |
| et al., | ) | Hon. Nicholas J. Bua |
| | ) | |
| Defendants. | ) | |

## JOINT POST–TRIAL MOTION

Plaintiff, Bruce Crosby, et al., by their counsel, Thomas P. Sullivan, Jeffrey D. Colman and Jenner & Block, Carol Moseley Braun and Richard H. Newhouse, Jr., and defendant, the Legislative Redistricting Commission, et al., by their counsel, William J. Harte, jointly move this Court for the entry of an order granting the following relief: (a) the modification of Judge Grady's amended dissenting opinion to reflect the facts relating to the negotiation and settlement of the *Crosby* litigation, and (b) the entry of an opinion and order by the Court's majority specifically finding that the consent decree negotiated by counsel in this case was done in full compliance with the law and the ethical standards of our profession.

Pending the resolution of this motion, the parties move, pursuant to Federal Rules of Civil Procedure 59(a), 60(b), and/or 62(b) that the consent decree entered by the Court on August 18, 1983, be arrested and held in abeyance so as not to prejudice the rights of the plaintiffs in the *Rybicki* case, should they desire to take an appeal.

In support of this motion, counsel state the following:

1. In his Amended Dissent to the Consent Decree dated August 18, 1983, Judge Grady states:

My dissatisfaction with the settlement is heightened by the fact that it includes not just the merits of the case but the important question of plaintiffs' attorneys' fees as well. The appearance of a possible trade-off is hard to avoid in those circumstances, and, for that reason, the courts have repeatedly admonished that any effort to negotiate the fees should be postponed until after judicial resolution of the merits.

Judge Grady then goes on to outline what he calls the "unfortunate" sequence of events leading up to the settlement of this litigation.

The "appearance of a possible trade-off" referred to by Judge Grady does not represent the "reality" of what occurred. The insinuations made by Judge Grady are very serious, but they are wrong.

2. Counsel for the *Crosby* plaintiffs and the defendant Legislative Redistricting Commission agree with Judge Grady that *if* any trade-off was made between attorneys' fees and the settlement of the merits of this case, the settlement agreement and consent decree should not have been approved by the Court, and the consent decree should be vacated by the Court at this time. This matter warrants the attention of all the members of this Court.

3. As demonstrated below, it was never the intent of counsel for either side to in any way link a settlement of the merits of this case with a settlement of the attorneys' fees issues. Counsel for both sides were mindful of the legal principles cited

by Judge Grady when they negotiated the settlement of this case. Counsel represent unequivocally to all three members of this Court that the merits of this case were settled prior to *any* discussion of the attorneys' fees issues. We decided to present a complete settlement agreement to the Court because we believed (wrongly, as it has turned out) that a consolidated presentation would facilitate the total and final resolution of this case.

4. Judge Grady has outlined in his amended dissenting opinion what he understands to be the sequence of events. Because Judge Grady did not have before him all of the facts, it is necessary for counsel to describe the settlement negotiations in this motion. As reflected by the attached verifications, Jeffrey D. Colman and William J. Harte swear under oath that the facts contained in this motion are true and correct. If any member of this Court desires an evidentiary presentation, counsel would welcome the opportunity to appear before the Court.

(a) The settlement negotiations in this case commenced during the trial of this cause in November, 1981. The initial settlement negotiations were prompted by comments made off the record, but in open court, by Judges Bua and Grady. After several days of trial, Judge Bua indicated in an off-the-record comment that he was extremely troubled by certain aspects of the evidence presented by the plaintiffs. At that time, Judge Grady indicated that he too was troubled by some of the evidence in the case. As a result of these comments, counsel for the Commission stayed up all night working on compromise proposals for presentation to counsel for the black and Hispanic plaintiffs. After settlement negotiations, those proposals were rejected by the plaintiffs and were subsequently submitted by the defendants to the Court as court exhibits.

(b) Settlement discussions continued between the *Crosby* plaintiffs and the defendants throughout the course of the trial. Then, after closing arguments, the Court asked to see counsel in chambers. Upon arriving in chambers, Judges Bua and Grady indicated that they had something they wanted to say to counsel. Judge Bua indicated that—though he might change his mind after reviewing post-trial materials— he was strongly inclined to rule against the Hispanics because they had not proven intentional discrimination, against the Republicans, and in favor of the black plaintiffs because he believed their evidence was sufficient to prove intentional discrimination. Judge Grady indicated that, while he might differ with Judge Bua as to some of the specific findings, he basically agreed with Judge Bua as to his conclusions. Following these remarks, the parties were encouraged by the Court to try to work out a settlement map that would resolve the litigation.

(c) Pursuant to the Court's suggestion, counsel once again participated in settlement negotiations. The Hispanic plaintiffs settled their litigation. However, despite significant efforts, the black plaintiffs were unable to reach a settlement with the Commission.

(d) Following the Court's decision of January 12, 1982, plaintiffs and defendants expended an enormous effort in the preparation of post-trial motions and numerous memoranda in support of those motions. In addition, plaintiffs' counsel filed fee petitions which, as Judge Grady has noted, were objected to by the Commission.

(e) On January 20, 1983, the Court issued its ruling on the post-trial motions filed by the *Crosby* plaintiffs. The *Crosby* plaintiffs' counsel transmitted the Court's opinions to their clients (see Exhibit 1) and began preparation of a proposed map.

(f) From January 20, 1983 through April 14, 1983, counsel for both sides devoted their attention to the resolution of the merits of the cause. As Exhibit 5, Appendix A to Plaintiffs' Consolidated Petition for an Award of Attorneys' Fees and Costs reflects, no attorney for the *Crosby* plaintiffs spent any time between January and April 14, 1983, working on any matter relating to the question of attorneys' fees. (On April 14, 1983, in anticipation of a settlement of

the merits, Mr. Colman began to prepare a supplemental fee petition.) Between January 20 and April 14, counsel for the *Crosby* plaintiffs and for the Commission worked on various alternative map proposals, met with and communicated with their clients, and participated in numerous conversations with opposing counsel with regard to the settlement of the merits of this case. At no time prior to April 20, 1983, did counsel for these parties discuss with one another any proposal relating to the settlement of the attorneys' fees issues. Prior to April 20, 1983, the only discussion between opposing counsel relating to attorneys' fees was that that question would be taken up only if and only after an agreement was reached on a new map.

(g) The new map, which was ultimately approved by the Court, was agreed to at Springfield, Illinois on April 14, 1983, by Speaker Madigan, Mr. Newhouse, Ms. Braun, Mr. Colman and Mr. Harte. Prior to agreeing to this map, counsel for the *Crosby* plaintiffs consulted with every black legislator from Chicago and each legislator—be they "independent" or "machine"—vehemently objected to alternative proposals and endorsed the map which was subsequently presented to this Court. Ms. Braun and Mr. Newhouse conditioned their approval of the map on the concurrence of Mayor-elect Harold Washington.

(h) On Sunday, April 17, 1983, Mr. Colman, Ms. Braun and Mr. Newhouse met with Mayor-elect Harold Washington. The map ultimately approved by the Court, as well as various alternatives, were shown to and discussed with Mayor-elect Washington, who approved the map ultimately approved by the Court.

(i) The next day, April 18, 1983, Mr. Colman, Ms. Braun, Mr. Harte, Mayor-elect Washington and Speaker Madigan met in Mayor-elect Washington's congressional office in Chicago. At this meeting, the map ultimately approved by this Court was discussed and approved by all present. The only issue relating to the map that was left unresolved as of this meeting related to the proposed changes on the West Side of the

City of Chicago that would have placed Senator Earleen Collins back into her existing senatorial district. It was agreed that the attorneys would make every effort to accommodate Senator Collins and that they would go to Court, if necessary, to seek the Court's approval for that change in the map.

(j) From April 18 until May 27, 1983, the day the settlement agreement and proposed consent decree were presented to this Court, the parties discussed (i) how to facilitate the Collins change, (ii) whether the defendants would agree to the publication of the Court's earlier decisions, and (iii) whether the defendants were going tö seek certain changes in the Court's findings relating to intentional discrimination.

The Collins issue was presented to this Court during the Seventh Circuit Judicial Conference in a court reported session at the Ambassador West Hotel on May 2, 1983, and was subsequently resolved in a manner satisfactory to the *Crosby* plaintiffs. With regard to the remaining two "substantive issues," the *Crosby* plaintiffs withdrew one paragraph from the settlement agreement which stated that the Commission agreed to the publication of this Court's opinions and the Commission's counsel decided not to seek any revisions of those opinions. (See Exhibit 2.)

(k) Plaintiffs finalized a draft of their Consolidated Fee Petition on April 23, 1983 (see Exhibit 3). At that time, discussions between counsel for the parties with regard to fees commenced—this was after agreement was reached on the new map.

On April 26, 1983, plaintiffs' counsel sent drafts of the consolidated petition to First Assistant Attorney General Paul Biebel and William J. Harte in order to facilitate a possible resolution of the attorneys' fees issues. (See Exhibit 4.) As noted in the April 26 letter, it was the position of plaintiffs' counsel that if there were a settlement of the fee issues (i) plaintiffs' counsel would forego petitioning for a multiplier greater than 20% and (ii) Mr. Newhouse and Ms. Braun would waive their request for fees for the period of time subsequent

to the filing of their interim petitions in February, 1982. [In April, 1983, the Seventh Circuit returned its decision on the attorneys' fees issue in the Congressional redistricting case. In that decision, a copy of which is attached hereto as Exhibit 5, the Seventh Circuit acknowledged the great import of redistricting cases and awarded a multiplier of 20% to the prevailing attorney, who also happened to be the attorney for the Commission in this case.] Several other discussions and meetings ensued between the parties relative to the attorneys' fees issues prior to the hearing before the Court on May 27, 1983.

5. The chronology outlined above summarizes the manner in which the issues in this case were settled. At no time were the attorneys' fees issues linked to the settlement of the substantive issues in this case. The settlement was negotiated at a time when blacks and whites in this City were greatly divided over the personalities involved in a heated mayoral election. Counsel dealt with their clients, incumbent politicians and each other in an effort to resolve this case in a manner that was fair and just and that would bring people together—not divide them. With the sole exception of Judge Grady, everyone with whom we have dealt—regardless of race—has expressed their gratitude for the efforts expended and the results achieved under extremely trying circumstances.

The settlement of this litigation should not be enveloped in the cloud of Judge Grady's charges. If he is correct, this Court has an obligation to set aside the Consent Decree. If he is wrong, as we know he is, both Judge Grady and this Court's majority should acknowledge that the settlement was negotiated in accordance with the law and the ethical standards of our profession.

Respectfully submitted,

Thomas P. Sullivan
Jeffrey D. Colman
JENNER & BLOCK
One IBM Plaza
Chicago, IL 60611
312/222–9350

/s/ Jeffrey D. Colman
One of the attorneys for the
*Crosby* Plaintiffs

Carol Moseley Braun
5434 South Hyde Park Blvd.
Chicago, IL 60615

Richard H. Newhouse, Jr.
5533 South Cornell
Chicago, IL 60615

William J. Harte
111 West Washington St.
Chicago, IL 60602
312/726–5015

/s/ William J. Harte
One of the attorneys for the
Defendants

## VERIFICATION

Jeffrey D. Colman, being duly sworn under oath, states that he has read the foregoing Joint Post-Trial Motion and the facts set forth therein are true and correct to the best of his knowledge.

/s/ Jeffrey D. Colman

SUBSCRIBED and SWORN to before me this 7 day of October, 1983.

/s/ Lynne B. Braver
Notary Public

## VERIFICATION

William J. Harte, being duly sworn under oath, states that he has read the foregoing Joint Post-Trial Motion and the facts set forth therein are true and correct to the best of his knowledge.

/s/ William J. Harte

SUBSCRIBED and SWORN to before me this 7 day of October, 1983.

/s/ Lynne B. Braver
Notary Public