Chester J. RYBICKI, et al., Plaintiffs,

v.

The STATE BOARD OF ELECTIONS OF the STATE OF ILLINOIS, et al., Defendants.

Miguel DelVALLE, et al., Plaintiffs,

v.

The STATE BOARD OF ELECTIONS OF the STATE OF ILLINOIS, et al., Defendants.

Bruce CROSBY, et al., Plaintiffs,

v.

The STATE BOARD OF ELECTIONS OF the STATE OF ILLINOIS, et al., Defendants.

Nos. 81 C 6030, 81 C 6052 and 81 C 6093.

United States District Court, N.D. Illinois, E.D.

April 27, 1984.

Thomas P. Sullivan, Jeffrey D. Colman, Jenner & Block, Carol Moseley Braun, Richard H. Newhouse, Jr., Chicago, Ill., for plaintiff Crosby.

Virginia Martinez, Raymond G. Romero, Mexican American Legal Defense and Educational Fund, Chicago, Ill., Vilma S. Martinez, Morris J. Baller, Mexican American Legal Defense and Educational Fund, San Francisco, Cal., Joaquin Avila, Mexican American Legal Defense and Educational Fund, San Antonio, Tex., Cesar A. Perales, Gabriel Kaimowitz, Lizette A. Cantres, Puerto Rican Legal Defense and Educational Fund, New York City, for plaintiff DelVallee.

Jerris Leonard, Ronald A. Goodbread, Kathleen Heenan, Jerris Leonard & Associates, P.C., Washington, D.C., Mayer, Brown & Platt, and Justin A. Stanley, Roger W. Barrett, Douglas A. Poe, Kenneth J. Jurek, Richard A. Salomon, Mayer, Brown & Platt, Chicago, Ill., for plaintiff Rybicki.

Tyrone C. Fahner, Atty. Gen., State of Ill., Chicago, Ill., for defendants State Board of Elections and James Edgar.

William J. Harte, William J. Harte, Ltd., Chicago, Ill., for defendant Legislative Redistricting Commission.

Before CUDAHY, Circuit Judge, and GRADY, and BUA, District Judges.

## MEMORANDUM ORDER

BUA, District Judge.

### I. HISTORY

These lawsuits, consolidated before this three-judge panel pursuant to 28 U.S.C. § 2284(a), were brought by three groups of plaintiffs against the State Board of Elections of the State of Illinois ("the Board"), members of the Board individually and in their official capacities, the Legislative Redistricting Commission ("the Commission"), members of the Commission individually and in their official capacity, and James Edgar, the Illinois Secretary of State in his official capacity. Each of the three groups of plaintiffs challenged the 1981 legislative redistricting plan for election of candidates to the Illinois General Assembly ("the Commission Plan").

In *Rybicki v. State Board of Elections*, No. 81 C 6030, plaintiffs alleged that the Commission Plan unlawfully discriminated against suburban voters in the Chicago area by disproportionately concentrating voting power in the City of Chicago. The *Rybicki* plaintiffs also alleged that the Commission Plan was politically unfair, contained noncompact districts and unnecessarily fractured political subdivisions. Plaintiffs in *Crosby v. State Board of Elections*, No. 81 C 6093, alleged that the Commission Plan intentionally discriminated

against black voters by diluting their voting strength and providing white voters a disproportionate opportunity to elect candidates of their choice. Plaintiffs in *Del-Valle v. State Board of Elections*, No. 81 C 6052, alleged that the Commission's redistricting effort similarly diluted the voting power of Hispanics.

Following a nine-day trial in which the Court heard testimony from 25 witnesses and received into evidence more than 200 exhibits, the Court, on January 12, 1982, issued written findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). *Rybicki v. State Board of Elections*, 574 F.Supp. 1082 (N.D.Ill.1982) ("*Rybicki I* "). In *Rybicki I*, the Court rejected the *Rybicki* plaintiffs' claims, on behalf of Republican and suburban voters, of noncompactness, partisan unfairness and impermissible fracturing of political subdivisions. *See Rybicki I*, 574 F.Supp. at 1096–1104. Regarding the *Crosby* plaintiffs' claims brought on behalf of black voters, the Court held that the Commission Plan purposefully diluted black voting strength in several significant instances. *Id.* at 1108. Specifically, the Court found evidence of "retrogression" in certain Senate districts (*id.* at 1108–09), evidence of purposeful racial discrimination in two additional Senate districts (*id.* at 1110), and evidence of racial vote dilution in three West Side Senate districts (*id.* at 1111). *Rybicki I*, however, rejected the *Crosby* plaintiffs' claims that "packing" certain black votes on Chicago's South Side and the creation of a "wall" separating black and white residential areas on Chicago's South Side constituted purposeful racial discrimination as defined by *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). *Id.* at 1114–22. Finally, the Court in *Rybicki I* approved a settlement agreement entered into between the defendants and the *Del-Valle* plaintiffs on behalf of Hispanic voters. After reviewing the settlement proposal, the Court concluded that the *Del-Valle* settlement agreement was "fair, adequate and reasonable to Hispanics and affords them a fair opportunity to elect candi-

dates of their choice to the General Assembly." *Id.* at 1124.

After *Rybicki I* was issued, however, and while various post-trial motions were pending before the Court, Congress amended the Voting Rights Act, 42 U.S.C. § 1973 (1976), as amended on June 29, 1982, by Pub.L. No. 97–205, § 3, 96 Stat. 134 (1982), 42 U.S.C.A. § 1973 (West.Supp.1983). In light of these amendments, the Court reconsidered the portion of *Rybicki I* which rejected certain claims presented by the *Crosby* plaintiffs. Utilizing the "results" test of the amended Voting Rights Act, the Court held that further relief was necessary to eradicate the "result" of vote dilution in voting districts in which the "packing" of black voters was proven at trial. *Rybicki v. State Board of Elections,* 574 F.Supp. 1147 (N.D.Ill.1983) (*"Rybicki II"*). Accordingly, the Court requested that the Commission submit new district lines in several areas to implement the requirements of *Rybicki II* under the amended Voting Rights Act. *Id.* at 1158.

Following our decision in *Rybicki II,* the *Crosby* plaintiffs and defendants reached agreement on new district lines. After reviewing the parties' proposed Settlement Map, and finding that the proposed changes substantially increased black voting strength in the South Side districts, the Court approved the *Crosby* settlement agreement and incorporated its terms into the redistricting plan ordered in *Rybicki I. Rybicki v. State Board of Elections,* 574 F.Supp. 1161 (N.D.Ill.1983) (*"Rybicki III"*).

Presently before the Court are petitions submitted by all plaintiffs requesting attorneys' fees under 42 U.S.C. § 1988 and costs under Rule 54(b) of the Federal Rules of Civil Procedure. The *Rybicki* plaintiffs request $226,030.50 in attorneys' fees and $31,018.18 in costs. The *Crosby* plaintiffs request $357,688.80 in fees and $71,378.10 in costs. The *DelValle* plaintiffs request $102,068.90 in fees and $2,600[1] in costs. The Commission objects to any fee award to the *Rybicki* plaintiffs but, in a letter to the Court dated June 6, 1983, has withdrawn its earlier objections to the *Crosby* and *DelValle* petitions. Defendants Edgar and the State Board of Elections object to any fee award to the *Rybicki* and *Crosby* plaintiffs and, although conceding that the *DelValle* plaintiffs are entitled to a portion of their requested fees, object to the amount of fees and costs the *DelValle* plaintiffs have requested. Although the Commission believes the *Crosby* and *DelValle* plaintiffs' request for a 20-percent multiplier is reasonable, the remaining defendants strenuously object to the award of any multiplier in these cases.[2]

For the reasons stated below, we deny the *Rybicki* plaintiffs fees and costs, as they did not prevail in their lawsuit. We award the *Crosby* plaintiffs $255,795.25 in attorneys' fees and $71,378.10 in costs. The *DelValle* plaintiffs are awarded $78,580 in attorneys' fees and $2,600 in costs.

## II. DISCUSSION

The Civil Rights Attorneys' Fees Act, 42 U.S.C. § 1988, allows federal courts discretion to award reasonable attorneys' fees to prevailing parties in federal civil rights actions. In this Circuit, a plaintiff will be considered a prevailing party if the plaintiff has succeeded " 'on any significant issue in litigation which achieves some of the benefit the part[y] sought in bringing suit.' " *Illinois Welfare Rights Organization v. Miller,* 723 F.2d 564, 566 (7th Cir.

---

**1.** The *DelValle* plaintiffs actually seek $3,000 in costs. The $3,000 figure, however, is apparently an error in computation because only $2,600 in costs are itemized. *See DelValle* Consolidated Petition, at 5.

**2.** Defendants Edgar and the Board also argue that the defendant Commission members are exempt from § 1988 liability based upon legislative immunity. *See* Memorandum of defendants Edgar and State Board of Elections in Opposition to Plaintiffs' Petitions for Interim Awards of Attorneys' Fees and Costs, filed April 5, 1982, at 2–3. The attorney for the Commission, however, has never raised this issue and, in fact, does not dispute the award of fees to the *Crosby* and *DelValle* plaintiffs. Any such immunity defense has therefore been waived and is not properly before the Court. *See Cohen v. Maloney,* 428 F.Supp. 1278, 1283 (D.Del.1977).

1983), (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983)). The threshold question of whether a party prevailed should not, however, involve a highly technical determination, but rather should be resolved in a "practical sense." *Dawson v. Pastrick*, 600 F.2d 70, 78 (7th Cir.1979).

### A. *The Rybicki Plaintiffs*

In *Rybicki I*, we rejected each of the *Rybicki* plaintiffs' theories of liability, brought on behalf of Republican and suburban interests, of noncompactness, partisan unfairness and impermissible fracturing of counties and suburban communities. *Rybicki I*, 574 F.Supp. at 1089–92. In regard to the interests of Republican and suburban voters, therefore, the *Rybicki* plaintiffs failed to prevail on any claims presented to this Court. The *Rybicki* plaintiffs, however, assert that because the final Commission Plan ordered by this Court ultimately benefitted Republican and suburban interests, they should be considered prevailing parties under the "catalyst" principle articulated in *Stewart v. Hannon*, 675 F.2d 846 (7th Cir.1982). Similarly, the *Rybicki* plaintiffs contend that they should be considered prevailing parties because their complaint acted as a "catalyst" in forcing defendants to grant the *Crosby* and *DelValle* plaintiffs relief.

■ In *Stewart*, the court recognized that a prevailing party need not always prevail by pursuing the lawsuit to a favorable verdict in order to obtain fees under § 1988. In fact, a plaintiff will be considered a prevailing party for purposes of § 1988 if "the lawsuit acted as a catalyst, or was a material factor in the defendant's decision to change the disputed practices...." *Stewart*, 675 F.2d at 851. This principle was recently reaffirmed in *Illinois Welfare Rights Organization v. Miller*, 723 F.2d 564 (7th Cir.1983). In that case, the Seventh Circuit stated that:

> [t]he test for whether a plaintiff is a prevailing party in a settled case is twofold. First, "the plaintiff['s] lawsuit must be causally linked to the achieve-

ment of the relief obtained," and second, "the defendant must not have acted wholly gratuitously...."

*Id.* at 566 (quoting *Harrington v. DeVito*, 656 F.2d 264 (7th Cir.1981), *cert denied*, 455 U.S. 993, 102 S.Ct. 1621, 71 L.Ed.2d 854 (1982)).

■ Although the *Rybicki* plaintiffs have failed to specify exactly what relief they obtained for Republican and suburban voters, we presume their reference is to Court Exhibits 1A, 2A and 2E which were presented by the Commission at trial in response to the suburban objections. Any benefit, however, which the Republican and suburban objections. Any benefit, however, which the Republican and suburban interests obtained as a result of these changes was simply not the result of the *Rybicki* lawsuit. Court Exhibit 2A was adopted, in part, to alleviate certain ancillary effects of our decision to grant the *Crosby* and *DelValle* plaintiffs relief. *See Rybicki I*, 574 F.Supp. 1082, 1125 n. 107 (N.D.Ill.1982). Furthermore, any other resulting benefit to the Republican and suburban interests was not required by law as indicated by our rejection of the *Rybicki* plaintiffs' claims at trial. Although the Commission changes may have benefitted the Republican and suburban interests, they were not required by *Rybicki I* and therefore cannot substantiate a finding that the *Rybicki* plaintiffs prevailed in this action. *See Nadeau v. Helgemoe*, 581 F.2d 275, 281 (1st Cir.1978).

■ Finally, the *Rybicki* plaintiffs urge this Court to consider them prevailing parties because their lawsuit also alleged racial vote dilution as a ground challenging the Commission Plan. The *Rybicki* plaintiffs, however, admit that before trial they agreed to have the *Crosby* and *DelValle* plaintiffs "principally pursue those claims." *Rybicki* Reply Memorandum filed April 22, 1982, at 8. For all practical purposes, the *Rybicki* plaintiffs sought relief for Republican and suburban interests and not black or Hispanic interests. Although the *Rybicki* plaintiffs brought considerable legal talent and financial resources to the litiga-

tion, we decline to consider them as prevailing parties merely because their complaint included minority claims.

■ Viewing this litigation in a "practical sense," the *Rybicki* plaintiffs failed to prevail on any claims they presented at trial. Furthermore, in light of the *Crosby* and *DelValle* plaintiffs' participation in this litigation, we decline to accept the proposition that the *Rybicki* lawsuit acted as a "catalyst" in obtaining relief for any plaintiffs in these cases. *Cf. Dawson v. Pastrick,* 600 F.2d 70, 79 (7th Cir.1979). The petitions for fees and costs filed on behalf of the *Rybicki* plaintiffs are therefore denied.

### B. *The Crosby Plaintiffs*

Although the Commission does not object to any aspect of the *Crosby* plaintiffs' fee request, the remaining defendants argue that the *Crosby* plaintiffs are not prevailing parties and therefore not entitled to any portion of the fees they have requested. Alternatively, the remaining defendants argue that the amount of fees and costs the *Crosby* plaintiffs request is excessive and should be reduced. We address the prevailing party issue first and quite simply.

■ Defendants contend that because the *Crosby* plaintiffs were unsuccessful in persuading this Court to strike the entire Commission Plan as unconstitutional, they failed to contribute "in a significant way to the outcome of the suit, and thus have [not] prevailed in their suit." Memorandum filed April 5, 1982, at 5–6. The *Crosby* plaintiffs, however, have prevailed in their lawsuit for two reasons. First, the relief obtained by the *Crosby* plaintiffs in *Rybicki I* and *Rybicki II* clearly satisfies the threshold prevailing party requirement as defined in *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). In *Rybicki I,* the *Crosby* plaintiffs were successful in showing that the Commission Plan, in several significant instances, purposefully diluted black voting strength. In *Rybicki II,* the *Crosby* plaintiffs established that the Commission Plan,

in several instances, would be suspect under the amended Voting Rights Act. Clearly, the issues that the *Crosby* plaintiffs prevailed upon in *Rybicki I* and *II* were "significant" and achieved "some of the benefit" the *Crosby* plaintiffs sought in bringing their lawsuit. *See Hensley v. Eckerhart,* 461 U.S. at ——, 103 S.Ct. at 1939 (1983); *Illinois Welfare Rights Organization v. Miller,* 723 F.2d 564, 566 (7th Cir.1983). Second, the *Crosby* plaintiffs are prevailing parties due to the settlement agreement approved by this Court in *Rybicki III.* The settlement agreement, which accorded the *Crosby* plaintiffs even greater relief than they had obtained in *Rybicki I,* clearly represents a vindication of the *Crosby* plaintiffs' rights. *See Illinois Welfare Rights Organization v. Miller,* 723 F.2d at 566. The *Crosby* plaintiffs have therefore prevailed in this litigation and are entitled to a reasonable attorneys' fee award and costs.

Having concluded that the *Crosby* plaintiffs prevailed in their lawsuit, we next address defendants' argument that the amount of fees and costs requested is excessive and should be reduced. Defendants argue that the § 1988 fee award should be reduced because: (1) a substantial portion of the fee petition seeks compensation for time and effort spent on unsuccessful claims; (2) a substantial portion of the requested fees are derived from duplicative efforts; (3) the hourly rates requested are excessive; (4) certain costs which are requested are not properly recoverable; (5) two of the *Crosby* plaintiffs' attorneys should not be entitled to any fees; and (6) a multiplier of 20 percent is not justified. Each argument is addressed below.

■ We first determine whether the *Crosby* plaintiffs are entitled to recover fees attributable to unsuccessful claims. The resolution of that issue requires a two-step analysis. First, we must determine whether the unsuccessful claims were related to the claims on which the plaintiff succeeded. If so, we must then undertake

a second analysis to determine whether the overall results obtained justify compensating the Crosby plaintiffs for the hours spent on the related but unsuccessful claims. *Hensley v. Eckerhart,* 461 U.S. 424, ——, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983); *Illinois Welfare Rights Organization v. Miller,* 723 F.2d 564, 567 (7th Cir.1983). Successful and unsuccessful claims will be considered "related" if they involve a "common core of facts" or "related legal theories." *Id.* An unsuccessful claim will be considered *un*related to a successful claim when "the relief sought on the unsuccessful claim is intended to remedy a course of conduct entirely distinct and separate from the course of conduct that gave rise to the injury on which the relief granted is premised." *Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1279 (7th Cir.1983).

▪ Defendants Edgar and the Board argue that the *Crosby* plaintiffs' fee petition should be reduced by the amount of fees attributable to the *Crosby* plaintiffs' unsuccessful claim that a racially defined "wall" around the black communities constitutes invidious discrimination under the Fourteenth Amendment. We disagree. Throughout this litigation, the *Crosby* plaintiffs have sought to increase black voting strength by proving that the defendants, by adopting the Commission Plan, unlawfully discriminated against black voters. Plaintiffs' unsuccessful "racial wall" argument was factually and legally related to their successful "retrogression" and "packing" theories of liability also presented at trial. Much of the research devoted to the "retrogression" and "packing" theories undoubtedly overlapped the "racial wall" theory of liability. In fact, an analysis factually involving the "wall" but specifically tied to considerations of "packing" resulted in *Rybicki II* in the redrawing of the lines which the *Crosby* plaintiffs characterized as a "wall." Also, the racially-defined "wall" theory of liability was, in large part, an alternative legal theory of liability properly presented at trial and therefore properly included within the *Crosby* plaintiffs' fee petition. Rejecting an alternative

legal argument brought in good faith is not a sufficient reason to reduce a fee award under § 1988. *Hensley v. Eckerhart,* 461 U.S. 424, ——, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983). In any event, the "racial wall" claim was not intended to remedy a course of conduct "entirely distinct and separate" from the "retrogression" and "vote packing" claims presented at trial. *Cf. Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1278–82 (7th Cir.1983).

Having found that the *Crosby* plaintiffs' unsuccessful "racial wall" claim was related to their successful claims, we must next determine whether the overall results obtained justify compensating the *Crosby* plaintiffs on the "racial wall" claim. *Illinois Welfare Rights Organization v. Miller,* 723 F.2d 564, 567 (7th Cir.1983). "If the plaintiff has achieved only partial success, . . . compensating the plaintiff for all hours expended on the litigation may be excessive." *Id.* If, however, the plaintiff has obtained excellent results, the attorney should normally recover a full compensatory fee. *Hensley,* 461 U.S. at ——, 103 S.Ct. at 1940.

We have no hesitation in declaring that the *Crosby* plaintiffs achieved excellent results in this litigation. Faced with the heavy burden of demonstrating purposeful discrimination at trial, and faced with the difficult task of analyzing the recently amended Voting Rights Act in their Post-Trial Motions, the *Crosby* plaintiffs accomplished their objectives and, as a result, significantly increased black voting strength in the Chicago area. Numerous voting district boundaries were affected and, as we stressed, in *Rybicki III,* "a substantial step has been taken." *Rybicki III,* 574 F.Supp. at 1162. The fact that the results sought by the *Crosby* plaintiffs were achieved through a settlement agreement does not diminish the importance of the results obtained. *Maher v. Gagne,* 448 U.S. 122, 129–30, 100 S.Ct. 2570, 2574–75, 65 L.Ed.2d 653 (1980). This is especially true given that the *Crosby* settlement was reached after a trial on the merits. In sum, due to the excellent results achieved

by the *Crosby* plaintiffs, we decline to reduce their fee request by an amount attributable to unsuccessful but related claims.

Defendants Edgar and the Board further contend that the fees requested by the *Crosby* plaintiffs are inflated, derived from duplicative efforts, and excessive (both in the number of hours claimed and the hourly rates). We therefore examine the reasonableness of the fees requested by the attorneys who represented the *Crosby* plaintiffs under the principles articulated in *Waters v. Wisconsin Steel Works of International Harvester Co.*, 502 F.2d 1309 (7th Cir.1974), *cert. denied*, 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976).

1. *The Fee Petition of Jenner & Block*

The firm of Jenner & Block, which has represented the *Crosby* plaintiffs since November 3, 1981, has petitioned for a total fee of $279,808.80 (which includes a 20-percent multiplier) and for reimbursement of costs in the amount of $18,975.10. The lodestar amount of $233,174 is based upon the customary hourly rates charged by Jenner & Block. The hourly rates being charged vary between $175 (charged by Thomas P. Sullivan) and $40 (charged by paralegals). A total of 2,451.75 hours are claimed.

 Despite defendants' contentions to the contrary, and based upon our review of the Jenner & Block petition, we find the number of hours reasonable and, with one exception, the hourly rates reasonable. The hourly rates billed by partners of Jenner & Block range from $100 per hour to $175 per hour. The hourly rates billed by Jenner & Block associates range from $65 per hour to $79 per hour. We find that these hourly rates are reasonable. *See In*

*re Illinois Congressional Districts Reapportionment Cases*, 704 F.2d 380, 381 n. 1 (7th Cir.1983) ($80 and $165 hourly rates approved for experienced counsel); National Law Journal, Feb. 27, 1984, at 25–36 (average Chicago hourly billing rates for partners and associates—$127 and $74, respectively). We, however, believe that hourly rates of $55 to $70, billed for law students employed by Jenner & Block, are excessive. Instead, we believe $40 per hour is a reasonable hourly rate for such services and we accordingly reduce the lodestar by $2,478.75.[3] The factual and legal complexity of this case, together with the results achieved, justify a lodestar amount of $230,695.25. Similarly, we allow the $18,975.10 claimed by Jenner & Block as costs. We reiterate our complete satisfaction with the representation provided by Jenner & Block in this case.[4]

 In addition to a lodestar of $230,695.25, however, the *Crosby* plaintiffs request that a 20-percent multiplier be awarded by this Court. Plaintiffs cite *In re Illinois Congressional Districts Reapportionment Cases*, 704 F.2d 380 (7th Cir. 1983), in which the Seventh Circuit awarded a 20-percent multiplier, and argue that the *Crosby* lawsuit was more complex and more difficult than *In re Illinois Congressional District Reapportionment Cases*. We decline, however, to award any multiplier to the *Crosby* plaintiffs for two reasons. First, we believe that billing rates as high as $170 per hour already reflect the quality of the attorneys' services and their ability to analyze the complex factual and legal issues raised in this case. *See Blum v. Stenson*, —— U.S. ——, ———––——, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Tidwell v. Schweiker*, 677 F.2d 560, 570

---

**3.** The 92.25 hours billed by summer associates Jonathan K. Baum and Elizabeth V. Tanis are therefore compensated at $40 per hour.

**4.** Defendants' contention that paralegal and law clerk hours are not compensable under § 1988 is frivolous. Even the case cited in support of defendants' argument (*State of Illinois v. Sangamo Construction Co.*, 657 F.2d 855 (7th Cir. 1981)) affirmed an award which compensated paralegals and law clerks for their services. *Id.*

at 863. Interestingly, in *Sangamo*, it was the Illinois Attorney General's office seeking compensation for the services of *its* paralegals, law clerks and computer personnel. *Id.* In fact, paralegal and law clerk fees are routinely awarded in this Circuit. *See e.g., In re Illinois Congressional Districts Reapportionment Cases*, No. 81 C 3915, slip op. at 6–7 (N.D.Ill. May 25, 1982), *remanded on other grounds*, 704 F.2d 380 (7th Cir.1983).

(7th Cir.1982). Any additional upward adjustment of the lodestar based upon the quality of representation is unwarranted because "the basic rates [the attorneys] received were comparable to what they would have received in private cases." *In re Illinois Congressional Districts Reapportionment Cases,* 704 F.2d at 384. Second, the number of hours billed in this case, although not excessive under the circumstances, adequately reflects the complexity of the case. *See Blum,* —— U.S. at ——, 104 S.Ct. at 1548–49.

### 2. *The Fee Petitions of Braun and Newhouse*

Two of the *Crosby* plaintiffs, Carol Moseley Braun and Richard H. Newhouse, Jr., seek an award of $45,363 and $33,920, respectively. Braun requests compensation for 370.5 hours at an hourly rate of $100 and reimbursement of costs totaling $903. Newhouse requests compensation for 278.5 hours at an hourly rate of $100 and reimbursement of costs totaling $500. In addition, both of these attorneys request that the Court increase their fee requests by a 20-percent multiplier. Defendants Edgar and the Board object to any award to Braun and Newhouse for essentially two reasons. First, defendants argue that Braun and Newhouse, as *pro se* litigants, are not entitled to fees under § 1988. Second, defendants argue that because Braun and Newhouse testified at trial as witnesses, their dual roles as attorneys and witnesses constitute special circumstances which would make the award of attorneys' fees unjust.

Braun and Newhouse are Illinois legislators, attorneys and named plaintiffs in the *Crosby* lawsuit. According to their affidavits (which have not been contested by any defendants in this litigation), Braun and Newhouse were contacted by their constituents shortly after the 1980 decennial census for the purpose of challenging the apparent disparity between Illinois' black population and black political representation. At the urging of Bruce and Will Crosby, Braun and Newhouse prepared the *Crosby* complaint and sought input from various civil rights organizations concerning black political representation in Illinois. In November, 1981, Braun and Newhouse persuaded attorneys Tom Sullivan and Jeff Colman, from the firm of Jenner & Block, to enter the case and represent the *Crosby* plaintiffs at trial. In return, Braun and Newhouse agreed to continue to act as co-counsel for the *Crosby* plaintiffs and assist Messrs. Sullivan and Colman in preparing for trial. After Jenner & Block entered the case, Braun and Newhouse met with potential witnesses, census bureau officials, demographers, community groups, civil rights groups, and politicians in an attempt to develop "support for the case ... and/or promote the issue with the firm of Jenner & Block and others in preparation for trial...." Newhouse Affidavit, at ¶ 6. The lawyers from Jenner & Block agree that Braun and Newhouse were actively involved in the preparation and trial of the *Crosby* case. Sullivan Affidavit, at ¶ 4. Although during the initial stages of the lawsuit neither Braun nor Newhouse anticipated that their testimony would be necessary in the case, both Braun and Newhouse were called as witnesses at trial to testify on behalf of the *Crosby* plaintiffs.

We first address defendants' argument that Braun and Newhouse, as *pro se* litigants, are not entitled to fees under § 1988. Generally, nonlawyer *pro se* litigants are not entitled to an award of attorneys' fees under § 1988. *See, e.g., Pitts v. Vaughn,* 679 F.2d 311 (3d Cir.1982); *Lovell v. Snow,* 637 F.2d 170 (1st Cir.1981); *Cofield v. City of Atlanta,* 648 F.2d 986 (5th Cir.1981); *Davis v. Parratt,* 608 F.2d 717 (8th Cir.1979). The courts reason that the principal purpose of § 1988 (to encourage laypersons to retain lawyers in meritorious civil rights cases) is not furthered by compensating a nonlawyer litigant who decides to proceed *pro se. See, e.g. Pitts,* 679 F.2d at 312. Courts also note the difficulty in placing a dollar value on a nonlawyer's services. *Id.* at 313. Finally, courts are hesitant in awarding fees to nonlawyer litigants because of the lawyer's traditionally

important function in providing a check against groundless and frivolous litigation. *Id.* Braun and Newhouse, however, argue that these policies are inapplicable when, as in this case, the *pro se* litigant seeking compensation under § 1988 is an attorney. Plaintiffs rely upon *Ellis v. Cassidy*, 625 F.2d 227 (9th Cir.1980), in support of their argument that Braun and Newhouse should receive compensation for their services.

▆ In *Ellis*, the Ninth Circuit permitted a lawyer, named as a defendant in a frivolous lawsuit, to recover attorney's fees from the plaintiff under § 1988. *Ellis*, 625 F.2d at 230. The court reasoned that a lawyer appearing *pro se*, unlike a layperson, actually performs legal services and actually suffers pecuniary loss due to the time lost from the lawyer's practice. *Id.* at 231. Furthermore, the court noted that the difficulty in measuring the value of a lay litigant's services is not present when a party-attorney seeks compensation. *Id.*

Although the facts of *Ellis* differ significantly from this case, the court's analysis is helpful in resolving the issue presented here. As in *Ellis*, the policies behind denying nonlawyer *pro se* litigants attorneys' fees under § 1988 do not apply in this case. First, since Braun and Newhouse are attorneys, we have no difficulty in measuring the value of their services. Second, the danger of a groundless and frivolous suit proceeding without the assistance of skilled counsel is not present here. We believe that Braun and Newhouse represented the *Crosby* plaintiffs professionally and sought experienced co-counsel early in the litigation. Clearly, their lawsuit was neither groundless nor frivolous. Third, it is evident that Braun and Newhouse suffered actual pecuniary loss due to their involvement in this lawsuit. Although both are members of the Illinois General Assembly, their private practices obviously were impaired during this litigation. Finally, given the unique nature of a legislative redistricting case, an award to Braun and Newhouse would further promote the policy of encouraging lay persons to retain lawyers in

such cases. In this case, the *Crosby* plaintiffs brought their grievances to their legislative representatives who also were licensed attorneys. The attorneys investigated the grievances, consulted with and retained experienced trial counsel, and assisted trial counsel in preparing the case for trial. In sum, no justification exists for denying Braun and Newhouse attorneys' fees merely because they were also named plaintiffs in the *Crosby* lawsuit.

Defendants also argue that awarding Braun and Newhouse attorneys' fees in light of their dual roles as attorneys and witnesses would be unjust under these circumstances. The ethical prohibition against a lawyer acting both as an advocate and a witness in a single proceeding are well known. As explained by the Seventh Circuit:

The [Disciplinary Rules contained in the ABA Code of Professional Responsibility] prohibit an attorney from accepting employment in contemplated or pending litigation when it is obvious that he will be called as a witness. If the need for his testimony becomes apparent after the attorney has undertaken employment in the case, he must withdraw from the conduct of the trial.

*United States v. Johnston*, 690 F.2d 638, 642 (7th Cir.1982) (en banc).

▆ In this case, neither Braun nor Newhouse reasonably could have been expected to anticipate that their testimony would be necessary at trial. However, when it became known at trial that their testimony would be required, they had an ethical obligation to withdraw as counsel for the *Crosby* plaintiffs under Disciplinary Rule 5–101(B). *United States v. Johnston*, 690 F.2d at 642. Furthermore, the two exceptions to Rule 5–101(B) do not apply. Braun and Newhouse's testimony was not "solely related to an uncontested or formal matter," but rather concerned a contested issue going to the merits of the lawsuit. Neither can it be said that Braun and Newhouse's refusal to testify would have resulted in a "substantial hardship" to the *Crosby* plaintiffs. *See Id.* at 642, n. 9.

Accordingly, Braun and Newhouse had an ethical obligation to withdraw as counsel when it became apparent that their testimony would be necessary during trial. Therefore, we disallow all hours claimed by Braun and Newhouse on and after the dates they testified at trial.[5]

We next address defendants' argument that the Braun and Newhouse fee petitions should be further reduced because (1) their efforts were duplicative of the time billed by Jenner & Block attorneys; (2) many of the hours billed are for nonlegal work; and (3) Braun and Newhouse failed to keep contemporaneous time records to support their petitions. We agree that a further reduction in the number of compensable hours claimed by Braun and Newhouse is warranted.

Although "substantially reconstructed" billing records spent on litigation may serve as a basis for a § 1988 fee award (*see Meisel v. Kremens*, 80 F.R.D. 419, 424 (E.D.Pa.1978), a percentage reduction in hours billed is often appropriate to guard against an unjustified inflation in the total number of hours billed. *See, e.g., Heigler v. Gatter*, 463 F.Supp. 802, 803 (E.D.Pa.1978). Similarly, a court may reduce a fee petition if duplication of efforts among attorneys is apparent or if the work performed by the attorneys was nonlegal in nature. *See Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717 (5th Cir. 1974).

Having carefully reviewed the affidavits of Braun and Newhouse, we find that the lack of contemporaneous time records, the substantial duplication of the attorneys' efforts, and the fact that some of the work performed by Braun and Newhouse was nonlegal in nature, warrant a further reduction of their lodestar request. Accordingly, the hours billed by Braun and Newhouse *before* November 3, 1981 (the

date Jenner & Block entered the lawsuit) shall be included fully in the lodestar computation. The hours billed *after* Jenner & Block entered the case, however, are reduced by 50 percent due to the substantial duplication of efforts, the nonlegal nature of some of the services performed, and the failure of Braun and Newhouse to keep contemporaneous time records.[6] Regarding a reasonable hourly rate of compensation, we find that $100 per hour is a reasonable and warranted value for their legal services.

In sum, we find that Braun is entitled to $6,350 in attorney's fees for services performed before November 3, 1981 (63.5 hours × $100) and $7,650 in attorney's fees for services performed between November 3, 1981 and December 7, 1981 (153 hours × $100 less 50%). We disallow all hours billed on and after December 7, 1981, the date Braun testified at trial. We also allow the $903 claimed by Braun as costs.

Regarding Newhouse's fee petition, we find that he is entitled to $5,050 in attorney's fees for services performed before November 3, 1981 (50.5 hours × $100) and $6,050 in fees for services performed between November 3, 1981 and November 30, 1981 (121 hours × $100 less 50%). We disallow all hours billed on and after November 30, 1981, the date Newhouse testified at trial. We allow the $500 claimed by Newhouse as costs. Finally, we find that there are no circumstances present which justify the application of a multiplier to the Braun or Newhouse fee petitions.

### 3. *Additional Costs Claimed by the Crosby Plaintiffs*

The *Crosby* plaintiffs request that $50,-000 be awarded to National Technologies Unlimited ("NTU") for expert and consulting services rendered to the *Crosby* plaintiffs' counsel. In addition, the *Crosby*

---

**5.** Braun testified on December 7, 1981; her petition is therefore reduced by 154 hours. Newhouse testified on November 30, 1981; his petition is therefore reduced by 107 hours. *See* Exhibit 3 to *Crosby* plaintiffs' Consolidated Petition.

**6.** Braun's petition is therefore further reduced by 76.5 hours and Newhouse's petition is further reduced by 60.5 hours.

plaintiffs request $1,000 in expert witness fees for the services of Robert Starks.

■ Consulting expert and expert witness fees may, in the trial court's discretion, be awarded under § 1988. *Jones v. Diamond,* 636 F.2d 1364, 1382 (5th Cir. 1981). Such fees are normally awarded when the expert's testimony or assistance was "necessary or helpful in representing clients in civil rights litigation." *Id.* (citations omitted). As the *Diamond* court stressed, "[c]ounsel must have the assistance of experts to furnish effective and competent representation." *Id.*

■ This case was factually as well as legally complex. The testimony provided by Stark and the assistance provided by NTU was obviously "helpful" and, in our view, "necessary" to the effective presentation of the *Crosby* plaintiffs' lawsuit. The fact that many of the hours billed by NTU were spent preparing the *Crosby* plaintiffs' unsuccessful Offer of Proof does not negate NTU's important role in assisting the *Crosby* plaintiffs in this case. Furthermore, the *Crosby* Offer of Proof was "related" to the claims upon which the *Crosby* plaintiffs ultimately prevailed at trial. *See Illinois Welfare Rights Organization,* 723 F.2d 564, 567 (7th Cir.1983) and discussion *supra* at 856–857. We therefore allow costs of $50,000 claimed by NTU and $1,000 claimed by Robert Stark.[7]

In sum, we award $255,795.25 in attorneys' fees and $71,378.10 in costs to the *Crosby* plaintiffs. We explicitly find that such an award is reasonable in light of the excellent results the *Crosby* attorneys achieved for their clients. *See Illinois Welfare Rights Organization v. Miller,* 723 F.2d 564, 567 (7th Cir.1983).

### C. *The DelValle Plaintiffs*

Three attorneys representing the *DelValle* plaintiffs—Raymond Romero, Virginia Martinez, and Lizette A. Cantres—seek attorneys' fees of $102,068.90 (including a 20-percent multiplier) and costs in the amount of $2,600.[8] Romero claims a total of 385 hours; Martinez claims a total of 277.5 hours; and Cantres claims a total of 135 hours (including 18 hours of "travel time" between New York and Chicago).

The Court and all defendants agree that the *DelValle* plaintiffs prevailed in their lawsuit. Defendants Edgar and the Board, however, argue that the *DelValle* fee petition should be reduced for essentially three reasons. First, that the number of hours billed by the *DelValle* lawyers is excessive because much of their work was duplicative of the work performed by the attorneys in the *Crosby* lawsuit. Second, that the hourly rates requested by the *DelValle* attorneys are excessive. Third, that the award of a 20-percent multiplier is not warranted. We address each argument below.

■ The number of hours billed by the *DelValle* attorneys is not excessive and, in fact, is reasonable in light of the excellent results the *DelValle* lawyers obtained for their clients. Furthermore, the efforts of the *DelValle* attorneys were not duplica-

---

7. In his dissenting opinion, Judge Grady argues that, at least without an additional evidentiary hearing, the $50,000 award to NTU is not justified based on the present record. We, however, find that the affidavits submitted in support of the NTU fee request are sufficient to warrant the award. According to Braun, the expert consulting services provided by NTU included: (1) analysis of the Commission Plan; (2) preparation of the City of Chicago section of the Coalition Plan; (3) preparation of trial exhibits including maps, charts and statistical data; and (4) preparation of the Crosby Plan. Affidavit of Carol Moseley Braun, exhibit 3 to *Crosby* Consolidated Petition, at ¶ 4. In addition to Braun's affidavit, we have the benefit of an extensive nine-page breakdown of all of the fees billed by NTU. Consolidated Petition, Exhibit 3, Appen-

dix 2. That breakdown includes the name of the consultant, the date of service, the number of hours billed and a detailed description of the nature of the professional services rendered. Furthermore, we note that the attorney for the Commission, in a letter to the Court dated June 6, 1983, states that the lodestar requested by the *Crosby* plaintiffs (higher than our award) is reasonable. Finally, the *Crosby* plaintiffs have voluntarily reduced the NTU fee request from $80,040 to $50,000. In light of the above, we find that an evidentiary hearing is not necessary, and the *Crosby* plaintiffs are entitled to an award of $50,000 for the services of NTU.

8. *See supra* n. 1.

tive of the efforts of the *Crosby* attorneys. The *Crosby* plaintiffs and *DelValle* plaintiffs had distinct interests in this litigation and therefore were clearly entitled to separate counsel. *See Tidwell v. Schweiker,* 677 F.2d 560, 569–70 (7th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1874, 76 L.Ed.2d 806 (1983). Since we find no duplication of efforts, we decline to reduce the number of hours billed in the petition.

The hourly rates requested by the *DelValle* attorneys are not specified. Excluding the travel time billed by Cantres at $35 per hour, the remaining hours are billed at slightly over $100 per hour. As employees of nonprofit legal services organizations,[9] the *DelValle* attorneys are entitled to an award based on the prevailing market rate for their services. *Blum v. Stenson,* —— U.S. ——, ——, 104 S.Ct. 1541, 1544, 79 L.Ed.2d 891 (1984). We believe $100 per hour is reasonable for the time billed by all the *DelValle* attorneys with the exception of Cantres' 18 hours of travel, for which we believe $35 per hour is reasonable. Cantres' participation in the *DelValle* lawsuit was both reasonable and necessary to obtaining relief for the *DelValle* plaintiffs. The $2,600 amount claimed as costs is reasonable and therefore allowed. We explicitly find that the excellent results achieved by the *DelValle* plaintiffs justify a lodestar amount of $78,-580 and costs of $2,600. *See Illinois Welfare Rights Organization v. Miller,* 723 F.2d 564, 567 (7th Cir.1983).

Finally, we decline to adjust the *DelValle* attorneys' fees upward by a 20-percent multiplier. We believe the quality of the *DelValle* attorneys' services is reflected adequately in the hourly rates. *See Blum v. Stenson,* —— U.S. ——, ———–——, 104 S.Ct. 1541, 1549–50, 79 L.Ed.2d 891 (1984), *Tidwell v. Schweiker,* 677 F.2d at 570. The complexity of the suit is reflected in the number of hours billed. *See Blum,* —— U.S. at ——, 104 S.Ct. at 1548. No other

factors are present to justify a multiplier in the *DelValle* lawsuit.

## III. CONCLUSION

We deny the *Rybicki* plaintiffs attorneys' fees and costs because they did not prevail in their lawsuit. We award the *Crosby* plaintiffs $255,795.25 in attorneys' fees and $71,378.10 in costs as follows:

| | | | |
|---|---|---|---|
| Jenner & Block: | (fees) | $ | 230,695.25 |
| | (costs) | | 18,975.10 |
| Subtotal | | | 249,670.35 |
| Carol Mosely Braun: | (fees) | $ | 14,000.00 |
| | (costs) | | 903.00 |
| Subtotal | | | 14,903.00 |
| Richard H. Newhouse: | (fees) | $ | 11,100.00 |
| | (costs) | | 500.00 |
| Subtotal | | | 11,600.00 |
| National Technologies Unlimited: | | $ | 50,000.00 |
| Robert Starks: | | $ | 1,000.00 |

We award the *DelValle* plaintiffs $78,580 in attorneys' fees and $2,600 in costs as follows:

| | | | |
|---|---|---|---|
| Raymond Romero: | (fees) | $ | 38,500.00 |
| Virginia Martinez: | (fees) | $ | 27,750.00 |
| Lizette A. Cantres: | (fees) | $ | 12,330.00 |
| Costs | | $ | 2,600.00 |

GRADY, District Judge, dissenting in part and concurring in part.

I concur in the allowance of fees to the *DelValle* plaintiffs and the denial of fees to the *Rybicki* plaintiffs. While agreeing that the *Crosby* plaintiffs are prevailing parties and thus entitled to fees, I dissent from the awards made to Jenner & Block, Braun and Newhouse, United Technologies and Robert Starks.

## JENNER & BLOCK

I believe that $230,000.00 is an excessive amount for the work that was done by Jenner & Block in this case. I note initially that Jenner & Block negotiated a written retainer agreement with the *Crosby* plaintiffs pursuant to which their fee for handling the case through the district court was to be $50,000.00. They now seek to

---

**9.** The nonprofit legal services organizations petitioning for fees on behalf of the *DelValle* plaintiffs are the Mexican American Legal Defense and Education Fund, Inc. (MALDEF) and the Puerto Rican Legal Defense and Education Fund, Inc. (PRLDEF).

recover 5½ times what they bargained for with the plaintiffs. The majority has cut that somewhat to a little over 4½ times. I do not suggest that in seeking fees under the Act an attorney should necessarily be limited to the amount provided for in his fee agreement. On the other hand, that amount will usually be a good indication of what the attorney himself believed his services would be worth. I doubt that the case turned out to be any more extended or complex than Jenner & Block anticipated at the time the fee was set.

This case illustrates what can happen when hourly rates are multiplied by hours to yield a dollar figure. Hours have a way of mounting up, especially where, as here, numerous attorneys work on a case. The dollar figure yielded by the simple computation of hours multiplied by hourly rates may bear little resemblance to what would otherwise seem a reasonable fee.

This case calls for application of the rule that "Relief that is not a product of the litigation but that is the result of entirely independent events cannot properly be considered as part of the results obtained by the plaintiff's efforts." *Illinois Welfare Rights Organization, et al. v. Miller*, 723 F.2d 564, 568 (7th Cir.1983). The original relief granted plaintiffs on January 12, 1982, ("Rybicki I") was in large part a product of this court's own analysis of the facts and research of the law. The additional relief granted thereafter ("Rybicki II") was prompted by the 1982 amendments to the Voting Rights Act and the majority's independent evaluation of the specific impact of those legislative changes.

It is my view that a fee of $150,000.00 would generously compensate Jenner & Block for the work it did in this case.

## CAROL MOSELEY BRAUN AND RICHARD H. NEWHOUSE, JR.

There are several problems with the claims of Braun and Newhouse. One is that they kept no time records. As they state in their petitions, they have attempted to reconstruct the time they spent by examining the time records of Jenner & Block. Not only are the time entries in the Braun and Newhouse petitions unsupported by any contemporaneous records, they are wholly barren of any detail concerning what was done. During the trial, for instance, both Braun and Newhouse claim whole days of time on work they describe simply as "trial preparation," or "work on offer of proof." In *Brown v. Stackler*, 612 F.2d 1057, 1059 (7th Cir. 1980), the court held that a total denial of fees is "... an entirely appropriate, and hopefully effective, means of encouraging counsel to maintain adequate records and submit reasonable, carefully calculated and conscientiously measured claims when seeking statutory counsel fees."

Another problem—not unrelated to the insufficiency in record keeping—is the question of whether there is duplication between whatever work Braun and Newhouse did and the simultaneous efforts of Jenner & Block, their retained counsel. Jenner & Block entered the case early November 1981. The first time charge is Mr. Coleman's entry of November 3. Of the total 370.50 hours claimed by Braun, only 23.50 hours were spent prior to November 3, 1981. The same situation exists with respect to Newhouse. Of his claimed 278.-50 hours, only 50.50 hours were spent before November 3, 1981. In the case of both Braun and Newhouse, the bulk of their claimed time was expended during the progress of the trial.

I am also skeptical of the $100.00 per hour rate claimed by Braun and Newhouse. If I were inclined to allow them any fees at all, I would want to inquire into the hourly rates they are accustomed to charging clients in their law practices. Moreover, it appears that most of the time for which Braun and Newhouse claim compensation was spent in investigation, gathering statistics, and helping prepare maps. In *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717 (5th Cir.1974), the court noted that:

> It is appropriate to distinguish between legal work, in the strict sense, and investigation, clerical work, compilation of

facts and statistics and other work which can often be accomplished by non-lawyers, but which a lawyer may do because he has no other help available. Such non-legal work may command a lesser rate. Its dollar value is not enhanced just because a lawyer does it.

In spite of these reservations, I would allow Braun and Newhouse appropriate compensation for any legal work they did prior to Jenner & Block's entry into the case, were it not for a consideration which overshadows everything I have said so far. There is a serious problem with the effort of these claimants to play the dual role of witness and lawyer. (I do not think it is necessary to reach the broader question discussed by the majority, whether a lawyer appearing *pro se* is entitled to recover fees under the Act, because I focus on the fact that Braun and Newhouse were not simply parties but important witnesses in the case.) The ethical proscription against a lawyer testifying in a case in which he participates as an attorney is well known:

> The advocate-witness rule, which articulates the professional impropriety of assuming the dual role of advocate and witness in a single proceeding, has deep roots in American law. Today, the rule is reflected in the ABA Code of Professional Responsibility, which states as an "ethical consideration:"

> > The roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of a witness is to state facts objectively.

> The Code's Disciplinary Rules have codified this ethical consideration. The Rules prohibit an attorney from accepting employment in contemplated or pending litigation when it is obvious that he will be called as a witness. If the need for his testimony becomes apparent after the attorney has undertaken employment in the case, he must withdraw from the conduct of the trial. These requirements do not apply, however, in exceptional circumstances enumerated in the Disciplinary Rules: where the testimony will relate solely to an uncontested or formal matter and there is no reason to believe that substantial evidence will be offered in opposition to the testimony, and where refusal to testify would work a "substantial hardship" on the client. These ethical rules apply to all lawyers, including government prosecutors, although application of the rule varies depending on the circumstances in individual cases.

*United States v. Johnston*, 690 F.2d 638, 642 (7th Cir.1982) (en banc). The rule applies to bench trials as well as jury trials. *Id.* at 644.

The advocate-witness rule would appear to apply with particular force in this case, since if Braun and Newhouse considered themselves attorneys in the case at the time they testified, their testimony was affected not only by that fact but by the additional fact that they regarded themselves as having a contingent financial interest in the outcome of the case. The court was not advised at the time Braun and Newhouse testified that they were intending to claim substantial sums of money as attorneys' fees in the event plaintiffs prevailed. If they had that intention, it should have been made known to the court. In fact, all three members of the court were surprised when Braun and Newhouse petitioned for fees. It had not occurred to any member of the court that Braun and Newhouse regarded themselves as attorneys in the case as distinguished from parties plaintiff.

It seems to me unlikely that at the time they testified Braun and Newhouse considered their roles to be that of attorneys in the case. I think it more probable that they regarded themselves simply as plaintiffs who were vitally interested in the social and political issues presented. Their failure to keep any time records is entirely consistent with their having had no intention of submitting a claim for attorneys fees.

I believe that Braun and Newhouse have an ethical dilemma. If at the time they testified they regarded themselves as lawyers in the case, entitled to claim fees in

the event plaintiffs won, they were violating the advocate-witness rule. (It is immaterial that Braun and Newhouse did not question witnesses or argue from the lectern during the trial; they argued effectively from the witness stand and made their presence felt during the trial just as much as they would have had they been formally denominated trial counsel—certainly as much if not more so than some of the attorneys who sat through the trial as trial counsel.) On the other hand, if Braun and Newhouse did not regard themselves as attorneys in the case at the time they testified, their present effort to cash in retroactively is based on a misrepresentation.

Whatever their intention was at the time they testified, the fact that they did testify now precludes Braun and Newhouse from claiming attorneys' fees. The court cannot permit an attorney to defeat the advocate-witness rule by waiting until after he testifies to decide whether he will regard himself as having been an attorney in the case all along. The petitions of Braun and Newhouse for attorneys' fees should be denied.

## UNITED TECHNOLOGIES

In addition to her own fee application, Carol Moseley Braun has submitted the claim of United Technologies for $50,000.00. The majority has allowed full payment of this amount. United Technologies is the organization which furnished assistance to the *Crosby* plaintiffs in preparing statistical data, maps and other trial exhibits. The principal activity of the organization was to prepare the Crosby map, an exhibit which was never received in evidence and was tendered only as an offer of proof after the conclusion of the trial. The map had nothing to do with the relief that was granted in the case, and was no assistance whatever to the resolution of the issues.

Ms. Braun has furnished a "breakdown" of the charges by United Technologies. Appendix 2 to Exhibit 3 of Consolidated Fee Petition. This document, which is not verified by anyone from United Technolo-gies, says that six persons spent a total of 978 hours at rates ranging from $50.00 to $100.00 per hour, for a total of $81,040.00. For instance, Anthony C. Jackson claims 270 hours at $100.00 per hour for a total of $27,000.00. Wayne Jackson claims 248 hours at $100.00 per hour for a total of $24,800.00. Will Crosby claims 31 hours at $50.00 per hour for a total of $1,550.00. There is no indication as to the identity, educational background or other qualifications of any of these six persons or any indication of what their customary charges are for this kind of work or if, indeed, they customarily do this kind of work. Presumably, Will Crosby of United Technologies is the same Will Crosby referred to in the majority opinion as having been instrumental in initiating this case.

Ms. Braun states in her petition that "Despite the fact that NTU's hours and hourly rates justify a request in excess of $80,000.00, Mr. Anthony Jackson, President of NTU, has informed me that he believes $50,000.00 would be a fair and reasonable payment for the services rendered. I agree with Mr. Jackson." Consolidated Fee Petition, Exhibit 3, p. 2–3. It is on this basis that the majority has awarded United Technologies $50,000.00. I suggest that the factual basis for this award is totally lacking and that, at the very least, an evidentiary hearing is required to determine what amount of money would constitute reasonable compensation for whatever valuable service United Technologies may have rendered.

## ROBERT STARK

The majority allows Robert Stark the sum of $1,000.00, stating that his testimony was necessary and helpful to plaintiffs' case. My recollection of the court's reaction to Mr. Stark's testimony is precisely the opposite: I found him to be a biased witness whose testimony was not helpful in the least. I would allow no fees for Mr. Stark.

IT IS SO ORDERED.