**CULEBRAS ENTERPRISES CORP.,**
etc., Plaintiffs,

v.

**Miguel A. RIVERA RIOS, et al., Defendants.**

Civ. No. 79–425 HL.

United States District Court,
D. Puerto Rico.

April 8, 1987.

---

Jaime Sifre, San Juan, P.R., for plaintiffs.

Miguel de la Cuétara, John Mudd, Dept. of Justice, San Juan, P.R., for Dept. of Justice of Puerto Rico.

Alberto Tellechea, Orlando, Fla., for Kenneth Black, etc.

## OPINION AND ORDER

LAFFITTE, District Judge.

The Court considers plaintiffs' application for attorney's fees and costs under 42 U.S.C. § 1988. Plaintiffs' petition for attorney's fees was originally denied in an order dated June 27, 1985.[1] After considering the opinion in *De Arroyo v. Romero Barcelo*, 765 F.2d 275 (1st Cir.1985), released after that date, the Court partially reconsidered its opinion and order and granted plaintiffs attorney's fees on the ground they were prevailing parties under sect. 1988.[2] Plaintiffs then submitted an affidavit concerning fees and expenses per the reconsidered opinion and order. The affidavit/application raises fee issues involving legal ethics, attorney *pro se* litigants, the extent to which plaintiffs prevailed, and the reasonableness of time spent.

## ETHICAL CONSIDERATIONS

A total of five attorneys, five law clerks, and one paralegal are claiming fees for working on this case at various times between 1978 and 1984. Requested for this cummulative effort is $241,601.50. Two of the attorneys, Edward M. Borges and Raymond C. O'Neill, are also involved as clients in the litigation, being directors and stockholders in the plaintiff corporations. They are also the founding partners of O'Neill and Borges, the law firm retained by plaintiffs to prosecute the case. They personally account for $101,271.50 of the requested fees. Another member of the firm is Walter Klasson, who is listed in the

---

1. *Culebra Enterprises Corp. v. Rios*, 613 F.Supp. 146 (D.C.P.R.1985). In that order this Court also dismissed the claim for injunctive relief pursuant to the stipulation and the inverse condemnation claim for monetary damages for failure to state a claim. A recent decision, *Culebras Enterprises Corp. v. Rivera Rios*, 813 F.2d 506 (1st Cir.1987), affirmed this Court's dismissal of plaintiffs' inverse condemnation claim for damages.

2. *Culebra Enterprises Corp. v. Rios*, 622 F.Supp. 128 (D.C.P.R.1985).

application to the amount of $62,425. Two attorneys outside of the firm were apparently retained for ethical reasons to be attorneys of record when it appeared O'Neill and Borges would be called as witnesses at trial. They account for $56,815 in requested fees. The remaining $21,090 is abscribed to the work done by law clerks and paralegals.

Defendants object to plaintiffs' request for attorney's fees for O'Neill, Borges, and the other members of the firm, on the ground that they are not attorneys of record. Defendants argue that since DR5-101(B) of the Model Rules of Professional Responsibility requires withdrawal and disqualification of lawyers and members of their firm when it appears the lawyer may be called as a witness, with certain exceptions,[3] no fees are due from that time for work done on the case by any member of the firm O'Neill and Borges.

It is clear on the plain language of the canon that O'Neill and Borges, and their firm by imputation, should have disqualified themselves from representing plaintiffs. They admit they knew that as stockholders of plaintiffs they "ought" to be called as witnesses. That they had an inkling of the potential impropriety is evidenced in their decision to hire outside counsel as attorneys of record in order to maintain the appearance of propriety. But the appearance of impropriety is merely one of the reasons for the canon. The dual roles of witness and lawyer are inconsistent with the integrity of the adversarial system. It causes prejudice to the lawyer's client by impeaching the credibility of the lawyer as a witness and diminishing his persuasiveness as a lawyer. Conversely, it creates prejudice to the opposing party by inhibiting cross-examination of the lawyer-witness and imbuing his role as lawyer with the purifying effects of having taken the oath before the eyes of the jury. *ABA/BNA Lawyer's Manual on Professional Conduct*, sect. 61:505.

Plaintiffs have not offered any arguments why O'Neill and Borges should fall within the exceptions of the canon. The content of their potential testimony was not revealed to the Court. It assuredly would not have related to an uncontested matter or a formality. As stockholders and directors they were in a position to explain the actions of plaintiffs previous to filing the lawsuit. Refusal to allow them to act as counsel would not work a substantial hardship on the plaintiffs as their services were not of distinctive value in this case. To the contrary, Borges stated that the firm does not usually accept this type of case but did it as a favor to him and O'Neill. That they and plaintiffs willingly farmed out some of the work to outside counsel is another indication that the firm is not the "only man for the job."

---

**3.** Disciplinary Rule 5–101(B) of the ABA Code of Professional Responsibility provides:

(B) A lawyer shall not accept employment in contemplated or pending litigation if he knows or it is obvious that he or a lawyer in his firm ought to be called as a witness except that he may undertake the employment and he or a lawyer in his firm may testify:

(1) If the testimony will relate solely to an uncontested matter.

(2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.

(3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.

(4) As to any matter, if refusal would work a substantial hardship on the client because of the lawyer or his firm as counsel in the particular case.

The Model Rules of Professional Conduct are expressly adopted by the U.S. District Court, District of Puerto Rico in Local Rule 211.4(B).

Canon 22, Puerto Rico Canons of Professional Ethics, 4 L.P.R.A.App. IX, provides:

Except when essential to the ends of justice, the lawyer should avoid testifying in court in behalf or in support of his client. When a lawyer is a witness of his client, except as to merely formal matters, such as the attestation or custody of an instrument and the like, he should leave the trial of the case to another counsel.

Likewise, a lawyer should withdraw from the representation of his client when he finds out that the lawyer himself, one of his partners, or a lawyer in his firm, may be called to testify against his client.—Dec. 24, 1970, eff. Dec. 24, 1970.

■ It is true that the harmful effects the canon seeks to prevent are diminished somewhat by the retention of counsel other than the potential witnesses for actual trial advocacy. At least one state bar has ruled that where a corporate president testifies in a trial at which a member of his law firm is counsel for the corporation, imputed disqualification is not necessary, even in the absence of the exceptions, where the prejudice to the client would be *de minimus*. *ABA/BNA Lawyer's Manual on Professional Conduct: Ethics Opinions*, No. 84–3, p. 801:1320 (Arizona). This ruling, however, merely stands for the notion that the prejudicial effect of non-appearing, testifying counsel is less than that of appearing, testifying counsel. Under such a formulation it remains in the discretion of the court to determine when a non-appearing counsel's testimony is prejudicial to a client and harmful to the adversarial system. In the situation at bar, even under the most liberal of standards, the Court finds that the presence of O'Neill and Borges as founding partners of the law firm, and especially as lawyers still working on the case, would have caused credibility problems, and prejudiced both parties such that the opportunity for a fair and rightful adjudication would have been unduly compromised. The taint brought by O'Neill and Borges as witnesses undoubtedly would have extended to the work of all members of their firm who worked on this case. That no member of the firm appeared as counsel is more than offset by O'Neill and Borges continuing to work on the case.

■ Denial of attorney's fees is an appropriate sanction for violation of an ethical canon in certain circumstances. Disqualification and/or withdrawal is the preferred response when an ethical conflict arises. Should no withdrawal be forthcoming, however, and the plaintiff prevails, courts will generally not reverse a judgment. A better sanction is to deny fees, where appropriate. *See Hill v. Douglas*, 271 So.2d 1 (Fla.1973).

Since plaintiffs are seeking fees under Sect. 1988, denial is a simple and appropriate sanction. Declaring at this stage that the law firm should have withdrawn and denying them fees they have accrued ostensibly believing them compensable· is a harsh remedy. Had they wished to avoid the risk that certain of plaintiffs' attorneys would not be paid for their services, they should have made known their involvement from the beginning. The Court could have ruled on disqualification then and the performance of uncompensable legal work might have been avoided.

## ATTORNEY PRO SE LITIGANTS

As support for their contention that legal ethics preclude awarding attorneys fees to O'Neill and Borges, defendants argue that the situation presented here is not that of attorney *pro se* litigants, as urged by plaintiffs, because O'Neill and Borges are not parties to the suit. The effect of this *pro se* litigant distinction on the ethical considerations is significant, though perhaps not necessary to disposition of the entire issue of fees for these lawyers, as courts are divided on whether attorney *pro se* litigants are entitled to fees.

■ There is merit in defendants' characterization of O'Neill's and Borges' postures in this case. Borges and O'Neill are stockholders and officers in the three plaintiff corporations. While this fact no doubt led to O'Neill's and Borges' belief that they might be called as witnesses, and therefore should retain outside counsel, yet it does not completely identify the two lawyers with the interests of the corporation. There have been no attempts on either side to pierce the corporate veil. As neither O'Neill nor Borges are named plaintiffs in the complaint, they are not litigants, but merely potential witnesses.

■ The distinction can be important because some courts hold that the ethical ramifications are different when the lawyer-witness is also a party. Credibility concerns are not implicated. "No confusion of role or undue enhancement of advocacy results where the lawyer-witness' lack of disinteredness is evident from his or her status as a party-litigant." *Bottaro v. Hatton Associates*, 680 F.2d 895, 897 (2nd Cir.1982); *see also, International Electronics Corp. v. Flanzer*, 527 F.2d 1288

(2nd Cir.1975). There is nothing in the ethical canons to prevent a lawyer from representing himself. To allow non-lawyers to proceed *pro se* while denying the same privilege to lawyers would run counter to logic and work an injustice. *Duncan v. Poythress*, 777 F.2d 1508, 1515, n. 21 (11th Cir.1985).

Regardless, courts which have allowed fees for, and not just participation as, an attorney *pro se* litigant, have gone on to hold, in keeping with the strict standard of DR5–101(B), that attorneys "had an ethical obligation to withdraw as counsel when it became apparent that their testimony would be necessary during trial." All compensation for hours after that point were disallowed. *Rybicki v. State Board of Elections of State of Illinois*, 584 F.Supp. 849, 861 (N.D.Ill.1984). *See also, Shakman v. Democratic Organization of Cook County*, 634 F.Supp. 895, 901 (N.D.Ill. 1986). Under this rationale and under DR5–101(B), even if O'Neill and Borges could be considered parties to the suit, they should have completely withdrawn at the point at which they became aware their testimony would be needed at trial.

Furthermore, it is far from clear that an attorney *pro se* litigant is entitled in general, even when not a witness, to attorney's fees under sect. 1988. It could be argued that O'Neill and Borges are litigants in reality. As directors and stockholders they have an interest in the plaintiffs' cause so clearly identifiable as to preclude confusion of their roles. They want what the corporations want. Yet, ethical considerations aside, courts are divided on the issue of whether sect. 1988 contemplates attorney's fees for attorney *pro se* litigants. *Duncan v. Poythress*, 777 F.2d 1508 (11th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1659, 90 L.Ed.2d 201 (1986) (Burger, C.J., dissenting). The question is one of first impression in this circuit.

▇▇▇ The general rule is that *pro se* litigants are not entitled to attorney's fees

under sect. 1988. *Lovell v. Snow*, 637 F.2d 170 (1st Cir.1981). The courts that have repudiated the rule when lawyers are involved, have done so on prudential grounds and based on the legislative history of the statute.[4] Applying the same analysis, we find that the better rule is that attorney *pro se* litigants are not entitled to attorney's fees under sect. 1988.[5]

Contrary to the common understanding, the plain language of the statute does shed some light on the issue. It simply calls for attorney's fees for the prevailing party. The dissent in *Duncan, supra* at 1518 (Roney, J., dissenting) makes a strong case based on common definitions. An "attorney" is one who is legally appointed to act for another, emphasis on another. A person who acts for himself does not act for another and thus cannot act as an attorney. In the same regard, "pro se" refers to a person acting in his own behalf, without the benefit of an attorney. The dissent argues that to extend the definition of attorney in the statute beyond its plain meaning requires explicit action by Congress, given the ethical and legal issues involved. This stance is bolstered by the legislative history.

▇▇▇ The Attorneys Fees Awards Act was enacted in reaction to *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). That case held that the traditional American rule prohibiting fee shifting to losing parties cannot be avoided by means other than specific statutory exceptions on the part of Congress. "[I]t is apparent that the circumstances under which attorney's fees are to be awarded and the range of discretion of the courts in making those awards are matters for Congress to determine." *Alyeska*, 421 U.S. at 262, 95 S.Ct. at 1624. Because Congress had not acted expressly to allow fees in sect. 1983 actions, *Alyeska* dictated that no fees were allowable. The Attorneys Fees Awards Act, sect. 1988, was passed to allow such

---

4. 11th Cir. in *Duncan v. Poythress, supra;* N.D. Ill. in *Rybicki, supra,* and *Shakman, supra;* D.C.La. in *Lanasa v. City of New Orleans,* 619 F.Supp. 39 (D.C.La.1985).

5. *See Lawrence v. Staats,* 586 F.Supp. 1375 (D.C. D.C.1984).

fees. 1976 *U.S.Code Cong. and Admin. News*, 5908, 5911–12. Indicating the range of discretion given to a court under sect. 1988, Congress stated that "[i]t is intended that the standards for awarding fees be generally the same as under the fee provision of the 1964 Civil Rights Act." *Id.* at 5912. There is no evidence that the 1964 Civil Rights Act has ever allowed fees for attorney *pro se* litigants. Given the strictures on judicial expansion of fee awards contained in *Alyeska*, it is not proper for the Court to allow fees for attorney *pro se* litigants under sect. 1988 without the approval of Congress.

▆▆▆▆▆▆▆ Some courts have gleaned such approval from analysis of whether the purpose of sect. 1988 is fulfilled by allowing fees to attorney *pro se* litigants. The main purpose of sect. 1988 is to ensure access to competent counsel for citizens with meritorious civil rights claims. *Duncan, supra* at 1513; *Lawrence, supra* at 1379; *Rybicki, supra* at 859. The only "citizen" mentioned in the legislative history is the "citizen who must sue to enforce the law [and who] has little or no money with which to hire a lawyer." 1979 *U.S.Code Cong. and Admin.News*, at 5910. *See Lawrence, supra* at 1379. It has been stated in response to this point that while Congress certainly intended to help those with few financial resources, eligibility for fees does not depend on the ability of a plaintiff to pay his lawyer. Therefore, the financial need of an individual plaintiff is not the determinative factor in awarding fees under sect. 1988. *Duncan,* at 1511 [citing *Riddell v. National Democratic Party,* 624 F.2d 539, 543 (5th Cir.1980)].

The counterargument is, of course, that an attorney *pro se* plaintiff never hired a lawyer. He never had to. As a lawyer himself he possessed meaningful access to the courts. He does not need sect. 1988 to gain access to competent counsel for his civil rights claim. The Court in *Duncan, supra* at 1512, dismissed this counterargument by noting the lost opportunity costs which an attorney *pro se* litigant suffers due to the time consumed prosecuting his own case. If uncompensable, these costs could chill the pursuit of meritorious civil rights claims and defeat the purposes of the statute. Standing apart from the legal profession for a moment, however, one can see the guildlike protectionism inherent in this way of thinking. Lost opportunity costs are equally applicable to any employed individual who decides to proceed *pro se.* The Court notes that doctors, and possibly boat mechanics, are compensated at higher rates than many a lawyer, making their opportunity cost losses would be greater. Yet no one argues that they should be awarded *pro se* attorney's fees. And the fact that an attorney could be hired by someone else to handle a 1983 case, while a doctor or mechanic could not, which some courts have found significant, does not really have any relevance other than that an attorney might have more incentive and security in proceeding *pro se.*

In addition to implicating Congressional motives, the issue of fees for attorney *pro se* litigants raises various prudential concerns. The problem of valuation of services is not present when the *pro se* litigant is also an attorney. *Rybicki, supra* at 859; *Shakman, supra* at 901. The danger of an inexperienced *pro se* litigant spending excessive hours thrashing about on uncomplicated matters is likewise eliminated. On the other side, it is feared that allowing fees to attorneys will lead to abuse and frivolous suits, a virtual cottage industry of unemployed lawyers seeking to support themselves with groundless sect. 1983 claims. *Duncan* at 1515.

As to excessive time spent and valuation of services, the lodestar method, which is the base method endorsed by the First Circuit, already accounts for variations in these factors. Furthermore, in the wake of *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 16 L.Ed.2d 40 (1983), discussed *infra,* the results obtained in a case can be an important factor in determining fees. The results obtained become particularly intertwined with time spent where, in a case like the one at bar, plaintiff only received a fraction of the relief it sought. Under this regime there does not seem to be any reason for differentiating between lawyer and non-lawyer *pro se* litigants. In

order to be eligible for fees, both must have been successful in their claims, after all.

The risk of frivolous suits is likewise not affected by whether the *pro se* litigant is a lawyer or not. Both have the option of hiring experienced counsel to guard against frivolous suits and the spending of excessive time. The sanctions which attach for bringing 1983 cases in bad faith apply whether or not the litigant is a lawyer. *Duncan, supra* at 1515.[6] While the risk of frivolous suits may not be increased by allowing fees for attorney *pro se* litigants, neither is it reduced.

 In summary, attorneys Borges, O'Neill, and by imputation, attorney Klasson and the law clerks and paralegals in their firms, are denied attorney's fees because their participation as counsel in this case violated DR5–101(B), inasmuch as O'Neill and Borges were potential witnesses. Even if O'Neill and Borges could be considered attorney *pro se* litigants, thus changing the ethical considerations by allowing O'Neill's and Borges' participation as counsel, attorney's fees would be denied the two of them from the time they realized they might be witnesses, at the outset. Alternatively, fees are denied because O'Neill and Borges, as attorney *pro se* litigants, are not entitled to attorneys' fees at all under sect. 1988, in the circumstances of this case.

### REASONABLENESS OF TIME SPENT AND THE RESULTS OBTAINED

 Remaining for consideration are the amounts of fees to be awarded the attorneys who are not members of the firm of O'Neill and Borges. The two attorneys, Max Ramírez de Arellano and Jaime Sifre Rodríguez, who were hired successively by the firm as outside counsel, are claiming fees totalling $56,815, based on 516.5 hours compensated at a rate of $110 per hour. Determining the fee award entails looking at the reasonableness of the hours spent and the rate, as well as the degree of success obtained.

 The First Circuit employs the lodestar method to review the reasonableness of a petitioner's charges. *Furtado v. Bishop*, 635 F.2d 915 (1st Cir.1980). Under this approach, a fee-setting court establishes a threshold reference point, or lodestar, which is the number of hours reasonably spent multiplied by a reasonable hourly rate. The lodestar can then be adjusted up or down depending on a variety of factors, such as the quality of representation, unusual risk of litigation, novelty of the issues, and the results obtained, if they have not already been taken into account in computing the lodestar. *Boston and Maine Corporation v. Moore*, 776 F.2d 2, 6–7 (1st Cir.1985). The results obtained factor is especially important in this petition, as plaintiffs received no damages or injunction as requested, prevailing only in the form of a settlement stipulation.

Before *Hensley, supra,* the First Circuit awarded fees only for time spent on successful claims. *See Miles v. Sampson*, 675 F.2d 5 (1st Cir.1982). A court would exclude all hours spent on unsuccessful claims. *Hensley*, a petition under 1988 like the case at bar, made the degree of success obtained the foremost criterion for setting fees in cases where some claims fail. Though *Hensley* made it clear that not receiving damages did not necessarily doom any specific portion of a fee request, the language did not settle the question of whether the results obtained factor should be figured in the lodestar or after. "The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment." *Hensley*, 103 S.Ct. at 1941. The only specific guidance offered was that if a party prevailed on only one of six general claims, basing an award on a lodestar which reflects all claimed hours would clearly be excessive. *Id.* More generally, the Court stated that:

In [some] cases the plaintiff's claim for relief will involve a common core of facts or will be based on related legal theories.

6. *Carbana v. Cruz*, 588 F.Supp. 80, 84 (D.C.P.R. 1984).

Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation. *Id.* at 1940.

The decision in *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) restated the *Hensley* position, though with greater emphasis on the lodestar as the reasonable fee. The other factors are presumed to be reflected therein. To defeat the presumption in order to adjust the fee upward, still permissible but "rare," required specific evidence and detailed findings by the lower court. *Id.,* 104 S.Ct. at 1548–1550.

Two cases recently decided by the Supreme Court follow the *Hensley-Blum* approach. In *Pennsylvania v. Delaware Valley Citizens Council for Clean Air,* — U.S. ——, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986), the Court decided, focusing on *Blum,* that the "superior quality" of counsel's performance could not serve as an independent basis for enhancing an attorney's fee above the lodestar. The court explicitly left open the question of whether the likelihood of success could so serve.

In *Riverside v. Rivera,* — U.S. ——, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986), the court decided that plaintiffs' counsel was entitled to $245,000 in fees in a case which resulted in a $33,000 damage award to plaintiffs assessed against only 6 of the original 32 defendants. All of the claims for injunctive and declaratory relief failed. In rejecting defendants' attempt to exclude those hours spent on claims unrelated to the successful claims, the Court emphasized, echoing the language in *Hensley,* that all of the claims involved a common core of facts and related legal theories and could not be viewed as a series of discrete claims. The Court concluded that the District Court had properly found a reasonable relationship between the extent of success achieved and the amount of the fee award. *Id.,* 106 S.Ct. at 2688.

The necessity of choosing between these two tacks is somewhat obviated by the denial of fees for members of the law firm of O'Neill and Borges. That denial disposed of many hours that would have been considered excessive and excluded from the lodestar regardless of consideration of the results obtained. For instance, plaintiffs' attorneys petitioned for compensation for more than 520 hours spent researching and conferencing before the filing of the complaint. Lopping of hours there would have been only somewhat facilitated by the nature of the legal work and its documentation. The firm of O'Neill and Borges, easily fulfilling the requirements of *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 951–952 (1st Cir.1984), kept copious and precise, computerized records of each exertion of effort on the case. Being primarily engaged on the research side of the attack, some of the firm's research efforts can be directly attributed to the unsuccessful claims. Nevertheless, the large proportion of hours are attributed to such general activities as "work on files," "telephone conferences," "legal research," and the like. It is impossible to discern which of the claims are being addressed in such entries. Clearly, all entries after the date of settlement, August 16, 1984, involving pursuit of the ultimately unsuccessful damages claim would not be allowable.

The situation is compounded with the outside, appearing counsel, whose fees we are now considering. While more detailed as to the logistics of each entry, i.e., what motion or matter is being addressed, with whom and about what a telephone conversation was made, the majority of the entries of attorney Jaime Sifre Rodríguez, too, are far from clear as to what claim is involved. Furthermore, they do not each list the time spent, only monthly totals are given. Even worse, the fee documentation of attorney Max Ramírez de Arellano consists of merely cancelled checks.

■ The nature of these two appearing attorneys' contributions further discourages reflecting the extent of success in the

lodestar by excluding specific hours spent on unsuccessful claims. As appearing counsel they handled much of the physical lawyering, including taking depositions, inspecting documents, telephoning Court personnel, etc. This kind of work is probably even less susceptible to claim allocation than research. The better tack, despite the limited success, is to hold that all the hours spent by attorneys Jaime Sifre Rodríguez and Max Ramírez de Arellano were reasonably spent. No hours are excluded as having been spent specifically on the damages issue after settlement of the other claims because that issue was resolved through written briefs, which were not generated by these appearing counsel. We will then proceed to lower the fee award based on the factor of the results obtained, mindful that "specific evidence" and "detailed findings" are required by *Blum*, even though *Blum* only addressed "enhancement of the fee award." [7]

The nature of plaintiffs' success may be explicated as follows. Plaintiffs are landowners on the island of Culebra, a former U.S. Naval Reservation.[8] In the late 1960's, as the Reservation's termination was imminent, private acquisition ensued. The land was not zoned and existing Planning Regulations exempted agricultural land of 5 or more cuerdas[9] from regulation. Non-agricultural uses required Planning Board approval. The landowners had submitted a proposal for high density cluster development which was approved in 1969 by the Board but not pursued to the planning stage by the landowners as various interests began to give attention to Culebra and entrench on all sides of the development issue. In 1974 it became obvious that the government of Puerto Rico was contemplating restrictive zoning. As a result the landowners segregated their property into 5 cuerda agricultural purpose lots and attempted to sell them. On December 1, 1974 the land was zoned primarily "P," for public use only, and the rest "RO–25–c," allowing only one agricultural residence per 25 cuerdas. Those landowners who had previously subdivided their property could sell their parcels without Board approval, but no development projects were allowed which conflicted with the designated zoning. The effect was to freeze the property without any compensation for an indefinite time. The land was not marketable.

After unsuccessful attempts before the Board to have their development plans approved, the landowners filed suit in 1979, alleging that "P" and "RO–25–c" zoning amounted to unconstitutional deprivation of property without just compensation. Plaintiffs sought inverse condemnation damages, attorneys fees and costs, and an injunction restraining the Commonwealth from further depriving them of their property. During the course of litigation it became clear that the actions of the Commonwealth government were akin to those in other cases which were declared unconstitutional. It was equally clear that plaintiffs could not obtain damages. *See Citadel Corporation v. Puerto Rico Highway Authority*, 695 F.2d 31 (1st Cir.1982); *Pamel Corporation v. Puerto Rico Highway Authority*, 621 F.2d 33 (1st Cir.1980).[10] After extensive settlement negotiations, the parties submitted a Partial Settlement Stipulation dated August 16, 1984. All "P" land was rezoned "RO–25–c." Owners of all previously subdivided lots were given special authorization to build one residence on each small lot. The property was now marketable.

---

**7.** Upward adjustment of a fee award is not to be allowed except "in some cases of exceptional success." *Blum, supra,* 104 S.Ct. at 1548. While it is not apparently clear that a downward adjustment is subject to the same standard, out of an abundance of caution we are applying the *Blum* standard.

**8.** For a historical and detailed background on the use of the Island of Culebra by the Navy pursuant to Executive Order No. 8684 of Febru-

ary 14, 1941, and its effect upon the civil rights of the population of Culebra, *see* 2 *Der.Civ.* 105, 1970, Equity Publishing Corp.

**9.** 5 cuerdas equals 4.86 acres.

**10.** This Court, relying on the above cases, later dismissed plaintiffs' action for damages. The Court of Appeals affirmed, see footnote 2, *supra,* though on somewhat different grounds.

As stated earlier, plaintiffs were initially denied fees on the ground they were not prevailing parties. Then *De Arroyo v. Romero Barcelo, supra,* found that the "catalyst" rule applied in a case where the Commonwealth government had removed land use restrictions ostensibly on its own, but in the face of constitutional challenge. Plaintiffs had asked for damages, not injunctive removal of the restrictions. Under *Nadeu v. Helgemoe,* 581 F.2d 275 (1st Cir. 1978), the *De Arroyo* plaintiffs had received "some of the benefit sought" and were entitled to fees as "prevailing parties" commensurate with that success.

Here, plaintiffs asked for both damages and injunctive rezoning. They received neither. Plaintiffs had maintained that "P" and "RO–25–c" zoning was unconstitutional as applied. The government agreed to rezone only the "P" areas, and that to "RO–25–c." It did especially agree to allow plaintiffs to proceed with single residence development of their previously subdivided lots, notwithstanding the conflicting zoning requirements. Of the many benefits sought, this is the only obtained. It has made the plaintiffs' land marketable again. Whether plaintiffs could have received more benefit in terms of development potential had they proceeded to trial on the injunction issue and won, is a matter of conjecture. What is certain is that plaintiffs did not prevail on the damages issue.

This case can thus be distinguished from *Riverside v. Rivera,* the Supreme Court case which considered, but denied, an attempt by defendants to reduce attorneys fees based on the results obtained. Those defendants received damages, but not injunctive or declaratory relief. The claims brought against the 32 defendants arose from the same common core of facts and were essentially the same. The question was who did what to whom. Here, the facts in all claims arose from the same zoning actions by the Commonwealth, though proving damages would have entailed introduction of additional evidence. The legal theory of the inverse condemnation claim, however, was not related to that seeking injunctive and declaratory relief. Because a zoning regulation is unconstitutional does not mean that it constitutes a taking without compensation such that inverse condemnation damages lie. This separation is further evidenced by the resolution of the case. The constitutional claims were settled, while the damages claim was expressly reserved to plaintiffs in the settlement agreement, only to be later dismissed by this Court.

It can be said, then, that the damages claim is discrete and separable from the other claims. But because it is impossible to determine which discrete claims are being addressed in the fee petition entries, the proper procedure is to calculate the lodestar, then reduce the fee award based on the results obtained.

■ The lodestar is set as follows. For the work done by attorneys Jaime Sifre Rodríguez and Max Ramírez de Arellano, the Court finds that all 516.5 hours are reasonable. The Court also finds reasonable the rate of $110 per hour for attorneys of their experience in the relevant market. The product of these numbers, the lodestar, is $56,815.

■ Based on the results obtained, success on some claims through settlement by making plaintiffs' land marketable again, defeat on discrete claims for inverse condemnation damages, the Court in the exercise of its discretion reduces the lodestar of $56,815 by one half, for a fee award of $28,407.50. None of the other factors for adjusting the lodestar, even if proper, are applicable.

■ The Court further assesses costs in the following manner. The costs of the appraisal of the land and the "report relative to damages suffered by plaintiffs as consequence of the zoning imposed by defendants," each for $10,000, are disallowed because they both go toward the wholly unsuccessful damage claim. The report on the utility of the land as zoned for agriculture, for which plaintiffs claim $6,000, is to be taxed as costs on defendants. The remaining costs, including depositions and office costs, are assessed to defendants one half of what plaintiffs request. Of the $6,714.79 requested, $3,357.39 is allowed.

The Court is aware that some of this last item of costs includes charges generated in the office of the law firm of O'Neill and Borges, the participation of whose lawyers is uncompensable. Office costs are a neutral item, however, not subject to the same disqualifying considerations as attorney's fees. They would have been generated regardless of the attorney's professional affiliation. The total costs assessed are $9,357.-39.

WHEREFORE, this Court award plaintiffs' attorneys fees in the amount of $28,-407.50 and taxes $9,357.39 as costs, to be paid by defendants.

IT IS SO ORDERED.